2014-1376

# United States Court Of Appeals
# for the Federal Circuit

## VOLCANO CORPORATION,

*Plaintiff/Appellant,*

v.

## ST. JUDE MEDICAL, CARDIOVASCULAR AND ABLATION TECHNOLOGIES DIVISION, INC.; ST. JUDE MEDICAL, CARDIOLOGY DIVISION, INC.; ST. JUDE MEDICAL, U.S. DIVISION; ST. JUDE MEDICAL S.C., INC.; and ST. JUDE MEDICAL SYSTEMS AB,

*Defendants/Appellees,*

APPEAL FROM THE U.S. DISTRICT COURT FOR THE DISTRICT OF DELAWARE
IN CASE NO. 13-CV-687-RGA, JUDGE RICHARD G. ANDREWS

## VOLCANO'S OPENING BRIEF

| | |
|---|---|
| Frank E. Scherkenbach | Todd G. Miller |
| FISH & RICHARDSON P.C. | Michael M. Rosen |
| One Marina Park Drive | Craig E. Countryman |
| Boston, MA 02210-1878 | FISH & RICHARDSON P.C. |
| | 12390 El Camino Real |
| | San Diego, CA 92130 |

March 27, 2014

## CERTIFICATE OF INTEREST

Counsel for Volcano Corporation, certifies the following:

1.     The full name of every party represented by me is:  Volcano Corporation

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  N/A.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by me are:  N/A.

4.     The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or are expected to appear in this court are:

Fish & Richardson P.C.:  Frank E. Scherkenbach, Thomas L. Halkowski, Todd G. Miller, Michael M. Rosen, Craig E. Countryman, Ryan P. O'Connor, Christina Brown-Marshall, and Corrin M. Drakulich.

Dated:  March 27, 2014

*/s/ Craig E. Countryman*
Craig E. Countryman

# **TABLE OF CONTENTS**

**Page**

Certificate of Interest .................................................................i

Statement of Related Cases ........................................................ vi

Statement of Jurisdiction ......................................................... vii

Statement of the Issue............................................................. viii

Introduction ............................................................................ 1

Statement of the Facts ............................................................. 2

I.    The Technology:  Guidewires for Sensing Blood
      Pressure in the Arteries........................................................ 2

II.   The Patented Invention:  A Guidewire Equipped with an
      Accurate, Miniature Pressure Sensor That Can Access
      Even the Smallest Arteries. ................................................. 4

      A.    Volcano's Patents Show Examples of How a
            Miniature Solid State Pressure Sensor is
            Incorporated Into a Guidewire. .............................. 4

      B.    The Patents-in-Suit Have Claims Focused on the
            Sensor's Unique Location, Placement, and
            Mounting Within the Guidewire............................. 7

      C.    Volcano's Patent Portfolio Includes a Variety of
            Claims Covering Its Pioneering Pressure Sensing
            Guidewire Technology—Some That Require Two
            Coils, and Others That Do Not. ............................ 10

      D.    The PTO Understood the "Flexible Element" to
            Include More Than a Coil......................................... 9

III.  The Accused Products and the Parties' Prior Litigation
      History. .......................................................................... 12

IV.   The District Court's Claim Construction and Judgment. 13

## TABLE OF CONTENTS (continued)

Summary of the Argument..........................................................................16

Argument....................................................................................................17

    I.    The Term "Flexible Element" Should Be Construed to
    Have Its Broad Plain Meaning, Which is a Structure That
    Is Easily Bent. ...................................................................17

        A.    The Plain Meaning of a "Flexible Element" Is a
        Structure That Is Easily Bent, and Is Not Limited
        to a Coil. ...............................................................17

        B.    The "Exceptions" for Lexicography and
        Disavowal Do Not Apply, So "Flexible Element"
        Must Carry Its Full Plain Meaning.........................25

        C.    St. Jude Cannot Obtain Affirmance on the
        Alternate Basis that "Flexible Element" is a
        Means-Plus-Function Term.....................................29

    II.    The Judgment of No Literal Infringement Cannot Stand
    under the Correct Claim Construction. .............................30

Conclusion.................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alcon Research Ltd. v. Apotex, Inc.,*
  687 F.3d 1362 (Fed. Cir. 2012) ............................................... 20

*Am. Hoist & Derrick Co. v. Sowa & Sons,*
  725 F.2d 1350 (Fed. Cir. 1984) ............................................... 22

*Aria Diagnostics, Inc. v. Sequenom, Inc.,*
  726 F.3d 1296 (Fed. Cir. 2013) ............................................ 17, 23

*Aventis Pharms., Inc. v. Amino Chems., Ltd.,*
  715 F.3d 1363 (Fed. Cir. 2013) ............................................... 30

*Bayer CropScience AG v. Dow AgroSciences LLC,*
  728 F.3d 1324 (Fed. Cir. 2013) ............................................... 20

*Board of Regents of the Univ. of Texas Sys. v. Benq Am. Corp.,*
  533 F.3d 1362 ........................................................................ 20

*Comaper Corp. v. Antec, Inc.,*
  596 F.3d 1343 (Fed. Cir. 2010) ............................................ 18, 24

*Geo M. Martin Co. v. Alliance Mach. Sys. Int'l, LLC,*
  2007 WL 4105832 (N.D. Cal. Nov. 16, 2007) (Alsup, J.) ......... 22

*ICU Med., Inc. v. Alaris Med. Sys., Inc.,*
  558 F.3d 1368 (Fed. Cir. 2009) ............................................... 24

*ICU Med., Inc. v. B. Braun Med., Inc.,*
  344 F. Supp. 2d 663 (N.D. Cal. 2004) ............................. 22, 23, 24

*KSR Int'l Co. v. Teleflex Inc.,*
  550 U.S. 398 (2007) .............................................................. 24

*Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.,*
  __ F.3d ___ (Fed. Cir. 2014) ................................................. 17

*Lighting World, Inc. v. Birchwood Lighting, Inc.,*
  382 F. 3d 1354 (Fed. Cir. 2004) ............................................. 29

iv

**TABLE OF AUTHORITIES (continued)**

**Page(s)**

*Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.,*
170 F.3d 1373 (Fed. Cir. 1999) ................................................................. 15

*Phillips v. AWH Corp.,*
415 F.3d 1303 (Fed Cir. 2005) (*en banc*)................................................. 18, 19, 24, 25

*Regents of University of Minnesota v. AGA Medical Corp.,*
717 F.3d 929 (Fed. Cir. 2013)................................................................. 18, 24

*SanDisk Corp. v. Kingston Tech. Co., Inc.,*
695 F.3d 1348 (Fed. Cir. 2012) ................................................................. 19

*Saunders Group, Inc. v. Comfortrac, Inc.,*
492 F.3d 1326 (Fed. Cir. 2007) ................................................................. 28

*Thorner v. Sony Comp. Ent. Am. LLC,*
669 F.3d 1362 (Fed. Cir. 2012) ................................................................. *passim*

STATUTES

35 U.S.C. § 112(d).................................................................................16, 20, 22

OTHER AUTHORITIES

RANDOM HOUSE UNABRIDGED DICTIONARY 733 (2d ed. 1987) ................................. 18

RESTATEMENT (SECOND) OF JUDGMENTS § 16 cmt. a ................................................. 15

## STATEMENT OF RELATED CASES

There have been no prior appeals related to this case before this or any other appellate court. There is another suit between the parties, *St. Jude Medical, Cardiology Division, Inc. v. Volcano Corp.*, Case No. 10-cv-631-RGA-MPT (D. Del.), which relates to the parent patent of one of the patents-in-suit. That case remains pending in the U.S. District Court for the District of Delaware. Neither that case nor any other case will be directly affected by this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

The district court had jurisdiction over this patent infringement case under 28 U.S.C. §§ 1331 and 1338.

The district court entered a final judgment on March 17, 2014 that resolved all the issues in this case.  (A13-14.)  As part of that judgment, Volcano stipulated to a judgment of no literal infringement under the district court's claim construction, and further stipulated to a judgment of no infringement under the doctrine of equivalents based on the collateral estoppel effect of an earlier judgment in *St. Jude Medical, Cardiology Division, Inc. v. Volcano Corp.*, Case No. 10-cv-631-RGA-MPT (D. Del.).  (*Id.*) St. Jude dismissed all of its counterclaims without prejudice.  (*Id.*)  The judgment is thus final and appealable under 28 U.S.C. § 1295(a)(1).

Volcano filed a Notice of Appeal from that Final Judgment on March 18, 2014, which was timely under Federal Rule of Appellate Procedure 4(a)(1).  (A1707-08.) This Court thus has jurisdiction over the appeal under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUE

Should the judgment of non-infringement be reversed where the district court erroneously construed the term "flexible element" as limited to "a coil", even though:

    a.    The plain meaning of "flexible element" includes any structure that is easily bent, including a plastic hypotube, a balloon, and a coil;

    b.    The district court's construction renders superfluous dependent claims adding the requirement that the "flexible element" is a "coil";

    c.    The district court's construction renders invalid dependent claims adding the requirement that the "flexible element" is a "hypotube formed of a plastic material"; and

    d.    The intrinsic record contains no lexicography or disavowal that would justify narrowing the otherwise broad plain meaning of "flexible element."

## INTRODUCTION

This appeal turns on a single claim construction issue—the familiar error of limiting broad claim language to a specific example in the specification.

Volcano's two patents-in-suit relate to a cardiac guidewire that includes a tiny sensor (a silicon chip) that accurately detects blood pressure in the smallest arteries. (A15-30; A31-47.)  Constructing a guidewire with a sensor that was sufficiently small and isolated from forces which might adversely impact its accuracy posed a significant challenge.  (*Id.*)  The patents describe the guidewire's structure and the placement, mounting, and relative location of the sensor, including an example where the sensor is between two flexible coils.  (*Id.*)  The parent of one of the patents-in-suit claimed a guidewire with the sensor located between a first and second "coil."  (A1530.)

St. Jude's original guidewire design infringed the parent patent, which was asserted by Volcano in a prior suit, prompting St. Jude to replace one of the coils in its products with a flexible plastic hypotube.  But St. Jude otherwise continued to use the core of Volcano's invention.  So Volcano obtained the patents-in-suit, which require a sensor located between a first and second "flexible element" rather than specifically a "coil," and brought this suit to protect the full scope of its invention.  (A58-74.)

The district court erroneously limited the scope of the continuation patents to the same scope as the parent by construing "flexible element" to limit it to a coil. (A1-12.)  The plain meaning includes any structure that is easily bent and nothing in the intrinsic evidence justifies a narrower construction.  That warrants reversal.

<u>S</u>TATEMENT OF THE <u>F</u>ACTS

## I.      The Technology:  Guidewires for Sensing Blood Pressure in the Arteries.

This case is about a tool for determining whether a patient's coronary arteries are blocked.  For decades, doctors could assess blockages only by using x-rays and other visual techniques for looking at the arteries.  In the 1980s, researchers began developing devices called functional guidewires, which could be inserted into the arteries and provide a whole new level of information about the blood flow and pressure in those arteries.

Guidewires are inserted into an opening in the patient's leg or arm and threaded up through the blood vessels all the way to the small arteries that surround the heart.  (A24-26 at 3:46-4:33, 7:44-8:36.)  The guidewires at issue here include a sensor near the end, which measures blood pressure and transmits that information to equipment that processes and displays the results.  (*Id.*)  Figure 1 shows an overview of a system in which a guidewire (21) is inserted into a patient and connected to a display (29) through a series of connectors (72, 73, 27) and cables (26, 28):



*FIG_1*

(A24 at 3:32-45.)  Functional guidewires are very long (sometimes almost 10 feet, to reach from the leg to the arteries near the heart) and very thin (0.018 inches or less in diameter, to fit through narrow arteries and potential blockages).  (A26 at 8:33-36.)

2

A doctor can detect the presence and significance of a blockage by advancing the guidewire through the patient's arteries, past the blockage, and watching for decreases in blood pressure. (A24-26 at 3:46-4:33, 7:44-8:36.) Observing decreased pressure downstream (distal aortic pressure) relative to the pressure closer to the heart (proximal aortic pressure) suggests a blockage. (*Id.*) Using this information, the doctor can determine if medical intervention is necessary based on the magnitude of the pressure change. (*Id.*) For example, if the venous pressure is zero, a pressure drop from 100 to 70 (yielding a "fractional flow reserve" (FFR) of $70/100 = 0.70$) is indicative of a significant blockage requiring a stent, as in the figure below, which shows the sensor's position just after it has measured the pressure on the distal side of the blockage (and after it has already measured pressure on the proximal side):



A less severe pressure drop can be treated just with medication, or might even be left alone. So it is important to get the pressure measurement right.

3

Accuracy proved difficult as doctors sought to monitor pressure in the very small arteries close to the heart.  The patents-in-suit describe that prior art guidewires had been developed to monitor pressure in the coronary arteries.  (A23 at 1:24-29.)  But the arteries near the heart are extremely small, which made it difficult (and sometimes seemingly impossible) to design a sensor that was small enough to fit in those areas while still providing accurate pressure measurements.  (*Id.* at 1:29-35.)  The patents-in-suit explain that the prior art failed to devise a guidewire equipped with a tiny yet accurate pressure sensor and that there was an unmet need for one:

> [I]t has not been feasible prior to the present invention to provide such ultra miniature pressure sensors which are capable of being incorporated in a guide wire for making pressure measurements in very small arterial vessels.  There is therefore a need for a new and improved ultra miniature pressure sensor and a guide wire and apparatus utilizing the same.

(A23 at 1:38-48.)  The patents then describe the "present invention" as the solution— a solution being used today by both Volcano and St. Jude.  (A15-30; A31-47.)

## II.    The Patented Invention:  A Guidewire Equipped with an Accurate, Miniature Pressure Sensor That Can Access Even the Smallest Arteries.

### A.    Volcano's Patents Show Examples of How a Miniature Solid State Pressure Sensor is Incorporated Into a Guidewire.

The inventors succeeded where the prior art had failed because of the placement, mounting and location of their "ultra miniature pressure sensor."  Figure 3 of the common specification shows an example of the tip of a functional measurement guidewire in which the sensor (green) is contained in a housing (blue) with a cutout that exposes the sensor to the blood flow through the artery:

4



FIG_3

(A23-24 at 2:37-40, 3:65-4:19, 4:49-55.) The tip is a flexible, floppy structure because the end of the guidewire must easily and gently bend as the doctor advances it through the twists and turns of various arteries. (A24 at 4:17-33.) The examples in the patents show that a pair of coils (yellow) can provide this flexibility. (*Id.*) The pressure sensor is insulated from the mechanical stresses that may be created as the guidewire passes through the tortuous path of the vessels by the mounting and placement of the sensor and the rigidity of the housing relative to the coils.

Although the exemplary guidewires in the patents rely on two coils to provide flexibility, the patents suggest there is nothing special about using two coils, rather than something else. The patents explain that the portion of the guidewire that includes the coils "is substantially conventional," (A24 at 4:50-51), and they cite a prior patent of Volcano's predecessor (Cardiometrics) that disclosed use of the two-coil structure to provide a flexible type for a functional guidewire:

> The use of the two coils 46 and 54 on opposite ends of the housing 61 provides a very flexible floppy tip for the guide wire 21 as described in U.S. Pat. No. 5,174,295.

(A24 at 4:17-19.) Moreover, the patent explains that the figures show "a guidewire incorporating an ultra miniature pressure sensor of the present invention," (A23-24 at

2:29-36, 2:59-62, 3:1-3, 3:11-13.) So it isn't the use of two coils that is the invention—

it's the location, mounting, and placement of the pressure sensor within the guidewire.

In particular, the sensor is located in a relatively rigid housing with a cutout to expose

it to ambient blood flow while protecting it from mechanical stresses and mounted so

that the part responsible for taking pressure measurements does not touch the

housing's walls:



(A24-25 at 4:50-5:5, Fig. 4.)

The sensor includes circuitry that detects changes in pressure. For example,

Figures 7 and 8 show that the sensor has three electrical leads (107) that enter the

sensor from an insulated structure (106) and extend near a diaphragm (79):



(A25 at 6:36-67.) Through these leads, the sensor transmits voltage readings through

the guidewire, converts them to pressure readings, and displays them to the doctor.

6

(*Id.*)  The sensor is small enough to fit on a guidewire with a diameter no larger than 0.018 inches, (A28 at 11:11-30), making it "possible to utilize the guide wire 21 of the present invention with very small coronary vessels in the heart."  (A26 at 8:33-36.)

### B.   The Patents-in-Suit Have Claims Focused on the Sensor's Unique Location, Placement, and Mounting Within the Guidewire.

The two patents-in-suit—Nos. 8,419,648 and 8,419,647—have claims directed to the unique location, placement, and mounting of the pressure sensor within the guidewire's protective housing.  (A15-30; A31-47.)  The independent claims are directed to a pressure sensor apparatus where the sensor is located between a first and second "flexible element," and is mounted in a short housing with a cutout so the pressure sensitive area does not contact the walls of the housing (which would interfere with its accuracy).  (A28-30; A45-47.)  The claims also require that the sensor detect pressure changes using three electrical conductors, and that the sensor be small enough to be incorporated in a guidewire with a diameter of 0.018" or less.  (*Id.*)

Claim 1 of the '648 patent is representative for purposes of appeal and is reproduced below with the disputed "flexible element" terms in bold:

1.  A pressure sensor apparatus, comprising:

a long proximal hypotube having an outside diameter of 0.018" or less,

a flexible floppy tip extending distal of the long proximal hypotube, the flexible floppy tip comprising:

> a **first flexible element**, disposed near a distal portion of the long proximal hypotube, with an outer diameter of 0.018" or less and an increased flexibility relative to the long proximal hypotube;

7

a short hypotube sensor housing disposed near a distal extremity of the first flexible element, the sensor housing having:

> a cylindrical external wall having an outer diameter of 0.018" or less, a length between 1 mm and 5 mm, a lumen, and a cutout in the cylindrical external wall;

a **second flexible element**, disposed near a distal extremity of the short hypotube sensor housing, with an outer diameter of 0.018" or less and an increased flexibility relative to the long proximal hypotube; and

a solid state pressure sensor mounted within the short hypotube sensor housing, such that:

> a pressure sensitive region located at or near one end of the solid state pressure sensor projects into the lumen of the short hypotube sensor housing without contacting the cylindrical external wall of the sensor housing; and

> the pressure sensitive region is exposed to ambient by the cutout in the cylindrical external wall of the sensor housing,

> wherein the pressure sensitive region includes a diaphragm structure, a base plate, and at least one resistive element responsive to changes in pressure; and

> three electrical conductors extending from a proximal portion of the long proximal hypotube to the solid state pressure sensor, the three electrical conductors coupled to the solid state pressure sensor such that the coupled portions of the three electrical conductors and the solid state pressure sensor are positioned within the short hypotube sensor housing.

(A28 at 11:40-12:15.)

The dependent claims indicate that the first "flexible element" can be any number of structures, including a plastic hypotube, a coil, or a balloon:

16. The pressure sensor apparatus of claim 1, wherein the first flexible element is a hypotube formed of a plastic material.

8

17.  The pressure sensor apparatus of claim 1, wherein the first flexible element is a coil.

18.  The pressure sensor apparatus of claim 1, wherein the first flexible element comprises a balloon.

(A28 at 12:56-65; *see also* A29 at 14:10-17 (claims 36-38); A30 at 15:35-41 (claims 59-61); A45-46 at 12:28-29, 14:14-15 ('647 patent claims 4 and 30).)

### C.    The PTO Knew "Flexible Element" Includes More Than a Coil.

The PTO's treatment of the patents-in-suit further demonstrates that the claimed "flexible element" is not limited to a coil.  After Volcano first introduced claims with the "flexible element" language in the application that led to the '648 patent in suit, the PTO issued a restriction requirement recognizing that the "flexible element" included a plastic tube, a coil, and a balloon.  Specifically, the examiner said:

> A species election must be made regarding the flexible element:
> Species 1:  where the flexible element is a hypotube
> Species 2:  where the flexible element is a coil
> Species 3:  where the flexible element is a balloon . . .
> These species are distinct because each recite[s] a mutually exclusive embodiment.

(A782; *see also* A752-64 (relevant claim language).)  The PTO deemed the claims which further specified the type of flexible element to be withdrawn based on the restriction.

(A782.)  Volcano later reintroduced independent claims with the broad "flexible element" term, without further limitation or qualification, and explained why they were patentable over the prior art.   (A843-64.)  The PTO then allowed the '648 claims without any further objections.  (A1082-84; *see also* A1092 (claim index).)

9

The PTO's explanation for that decision again suggested that it understood the independent claims were not limited to the two-coil arrangement—there was no mention of a coil in the examiner's reasons for allowance for the '648 patent:

> The following is an examiner's statement of reasons for allowance:  No art of record discloses a pressure sensing system that has both a long and short tube in addition to the first and second flexible elements where the short tube houses a solid state sensor when combined with all of the other claim limitations of each independent claim.

(A1083.)  The PTO's reasons for allowing the '647 patent likewise did not make any mention of a two-coil arrangement.  (A374-75.)

### D.    Volcano's Portfolio Includes a Variety of Claims Covering Its Pioneering Technology—Some That Require Two Coils, and Others That Do Not.

The patents-in-suit are part of a family that describes and claims Volcano's novel incorporation of a miniature solid state pressure sensor into a guidewire:



The claims of those various patents demonstrate that Volcano's invention is not limited to incorporating its sensor into a guidewire with a two-coil structure. For example, claims 3 and 4 in first patent (No. 5,715,827) explicitly reference the two-coil structure, but claims 1 and 2 do not. (A1501.) Likewise, the second patent (No. 6,106,476) includes independent claim 13, which requires "at least one coil," and dependent claim 14, which adds the requirement that the guidewire has "an additional coil." (A1516.) The '476 patent also includes independent claim 16, which does not mention a coil, and dependent claim 17 which adds the requirement that "the flexible elongate member includes a coil." (*Id.*) The next patent (No. 6,767,327) includes claims to methods of using a guidewire to measure blood pressure (or velocity), none of which mentions a coil. By contrast, all the claims of the parents (Nos. 6,976,975 and 7,967,762) of each of the patents-in-suit reference two coils. (*See, e.g.*, A1530.)

The chart below summarizes the differences among the claims of the various patents in the family and whether they claim a coil or not:

| U.S. Patent No. | Claimed Subject Matter |
|---|---|
| 5,715,827 | Some claims require two coils; others do not require a coil |
| 6,106,476 | Some claims require two coils; others require "at least one coil"; others do not require a coil |
| 6,767,327 | No claims require a coil |
| 6,976,975 | All claims require two coils |
| 7,967,762 | All claims require two coils |
| 8,419,648 | Claims require two "flexible elements," with dependent claims directed specifically to a tube, coil, or balloon |
| 8,419,647 | Claims require two "flexible elements," with dependent claims directed specifically to a coil |

These differences demonstrate that when the Volcano inventors wanted to claim the two-coil arrangement, they did so specifically, unlike the claims of the patents-in-suit.

## III.    The Accused Products and the Parties' Prior Litigation History.

Volcano and St. Jude directly compete for sales of the patented guidewires. Volcano and St. Jude's predecessor, Radi Medical, competed peacefully in the marketplace for many years. But then St. Jude, a very large medical device manufacturer, bought Radi and launched a litigation campaign against Volcano starting in 2010. In response, Volcano asserted its '965 patent against St. Jude, and St. Jude eventually admitted that its PressureWire 4 and PressureWire 5 products, which have a pressure sensor just like Volcano's mounted in an open housing between two coils, literally infringed the asserted claims of that patent. *See St. Jude Medical, Cardiology Division, Inc. v. Volcano Corp.*, Case No. 10-631-RGA (Doc. No. 474) (Oct. 21, 2012).

Seeking to circumvent the '965 patent while continuing to use the core of Volcano's invention, St. Jude tweaked its design to replace one of the coils with a plastic hypotube—the design currently used in its PressureWire™ Certus and PressureWire™ Aeris products. (A64-70 at ¶¶ 44-55, 68-77.) Volcano maintains that those products still infringe the '965 patent because the plastic tube is equivalent to a coil. But a jury disagreed, even though, under the correct legal standard, the admissions of St. Jude's own expert establish infringement. *St. Jude Med. v. Volcano Corp.*, No. 10-631-RGA (D. Del.) (Doc. No. 485). That case remains pending in the district court, so the legal error there must wait for another day.

12

While that suit was proceeding, Volcano obtained the two patents in this case, which broadly require two "flexible elements," not two coils.  As soon as those patents issued, Volcano filed this suit in April 2013 to address St. Jude's continued use of Volcano's inventions.  (A58-74.)

## IV.   The District Court's Claim Construction and Judgment.

The district court, at St. Jude's request, conducted an early claim construction of a single disputed term—"flexible element."  Volcano argued that the term did not need construction and that, at most, it could simply be given its plain meaning:  a "structure that is easily bent."  (A4.)  By contrast, St. Jude argued that this term was a means-plus-function limitation both subject to § 112(f) and limited to the "corresponding structure" of a "coil spring," or, in the alternative, that the term was limited to a coil spring even if it were not subject to § 112(f).  (A4-8.)

The district court correctly held that the term "flexible element" is not subject to § 112(f).  (A4-8.)  Properly beginning with the "strong presumption" that the term is not means-plus-function because it does not include the word "means," the court correctly explained that the term connotes sufficient structure because the claim language "tells the PHOSITA where the flexible element is located in the invention (between the long proximal hypotube and a short hypotube sensor housing), the size of the flexible element (diameter of 0.018" or less), and describes its physical properties (the flexible element is more flexible than the long hypotube)."  (A6.)  The

court also relied on a dictionary definition that suggests "an element that is flexible does connote structure." (A7.)

But the district court then erred by nevertheless construing the term "flexible element" to limit it to a "coil." (A8-12.) The court was concerned that "the exact structure intended by the patentee would likely not be clear to the PHOSITA without consulting the specification" and then noted that when the "specification discusses flexibility, it is always in reference to a coil." (A8.)

The court's primary error was that it believed that "[f]lexible element does not have a previous meaning in the art to one of ordinary skill," (A9), even though several pieces of evidence show that the term does have a plain meaning to the skilled artisan, such as a dictionary definition, the dependent claims, and other patents that use the term—including some of St. Jude's own patents. The court did not explain why the asserted claims here should not be given their broader plain meaning instead of being limited to the specific best-mode example recited in the claims of the parent patent. Instead, the court merely stated that "[t]he term 'flexible element' does not appear in the specification itself" and noted that prior patents in the portfolio had claims that were limited to a two-coil structure. (A9-10.) Finally, the court acknowledged that claim differentiation would suggest that the term "flexible element" is broader than just a coil (which is added as a limitation in dependent claim 17), but refused to apply the doctrine because the patents-in-suit were continuations written during litigation and were filed many years after the 1994 application to which they claim priority.

14

(A9-10 n.3.)  As noted above, however, many earlier patents in the portfolio have claims that do not explicitly require a coil either—including claims 1 and 2 of the first parent in the family to issue—and many others include dependent claims that add the coil limitation.  All these patents were filed and issued years before the litigation between Volcano and St. Jude began in 2010.

In light of the district court's erroneous construction, Volcano stipulated to a judgment of no literal infringement.  (A1701-06.)  Moreover, Volcano stipulated to a judgment of no infringement under the doctrine of equivalents based on the collateral estoppel effect of the judgment in the parties' prior suit judgment on the '965 patent.[‡] (*Id.*)  St. Jude agreed to dismiss all its counterclaims without prejudice.  (*Id.*)  The district court thus entered a final judgment on the parties' conditional stipulations, (A13-14), and this appeal followed.

---

[‡] As noted above at p. 12, that suit remains pending in the district court because there is an unresolved inequitable conduct defense.  But the jury resolved the equivalents issue on the '965 patent against Volcano, and the district court denied JMOL, so the judgment on the equivalents issue in the prior suit is "final" for collateral estoppel purposes as applied to this case, even though it is still subject to appeal to this Court.  *See, e.g.,* RESTATEMENT (SECOND) OF JUDGMENTS § 16 cmt. a; *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373, 1381 (Fed. Cir. 1999).  And, lest there be any doubt, Volcano will be appealing the judgment of non-infringement on the '965 patent to this Court.

## SUMMARY OF THE ARGUMENT

The district court's overly narrow construction of "flexible element" should be reversed, and, as a result, so should the judgment of no literal infringement.

"Flexible element" has a broad plain meaning, reflected in the relevant dictionary definition, which includes any structure that is easily bent, not just a coil. The intrinsic evidence confirms this plain meaning. Claim differentiation demonstrates that the "flexible element" cannot be limited to a coil because dependent claim 17 explicitly adds this requirement—the district court's construction would render that claim superfluous. Moreover, other dependent claims state that the "flexible element" can be a plastic tube or balloon, so its meaning must be broad enough to cover all these structures. The district court's construction, by contrast, renders those dependent claims invalid under § 112(d). In addition, the prosecution history demonstrates that the PTO understood "flexible element" to have a broad plain meaning that included plastic tubes in addition to a coil.

Nothing justifies restricting the otherwise broad plain meaning of "flexible element." There is no lexicography or disavowal, and the district court did not point to one. In fact, the specification suggests the invention is not limited to a two-coil arrangement because it describes this part of the guidewire as "substantially conventional" and acknowledges the two-coil arrangement was already in the prior art. Moreover, the district court correctly found the term was not subject to § 112(f). Volcano's construction should thus be adopted.

16

<u>**ARGUMENT**</u>

**I.    The Term "Flexible Element" Should Be Construed to Have Its Broad Plain Meaning, Which is a Structure That Is Easily Bent.**

This Court reviews claim construction *de novo.  Lighting Ballast Control LLC v. Philips Elecs. N. Am. Corp.*, __ F.3d ___ (Fed. Cir. 2014).  "The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comp. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "There are only two exceptions to this general rule:  1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Id.*

Here, "flexible element" has a broad plain meaning that is not limited to a coil, and the patentee did not narrow it through lexicography or disavowal.  The district court thus erred by limiting the term to the example in the specification.  *See, e.g., Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1301 (Fed. Cir. 2013).

**A.    The Plain Meaning of a "Flexible Element" Is a Structure That Is Easily Bent, and Is Not Limited to a Coil.**

**1.    The Intrinsic Evidence Demonstrates the Term's Broad Plain Meaning.**

The plain meaning of "flexible element" to the skilled artisan—as evidenced by the words themselves, the dependent claims, the other patents in the family, and the PTO's understanding of those words—is broad and covers much more than a coil.

As an initial matter, the words "flexible element" themselves demonstrate the breadth of the claims. These are ordinary English words, and, as such, this is one of the "cases in which the ordinary meaning of claim language may be readily apparent even to lay judges." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1314 (Fed Cir. 2005) (*en banc*). The words themselves cover any structure that is pliable or easily bent. Indeed, the dictionary definition confirms this understanding:

> flexible. 1. capable of being bent, usually without breaking; easily bent . . . 2. susceptible to modification or adaptation.; adaptable . . . 3. willing or disposed to yield; pliable . . . 4. a flexible substance or material, as rubber or leather.

*See* RANDOM HOUSE UNABRIDGED DICTIONARY 733 (2d ed. 1987). It is appropriate to look to these types of general dictionary definitions to show a claim term's plain meaning where, as here, the term consists of commonly understood words. *See, e.g., Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) ("The patent specification does not assign or suggest a particular definition to the term 'case.' Therefore, in determining the ordinary and customary meaning of the claim term as viewed by a person of ordinary skill in the art, it is appropriate to consult a general dictionary definition of the word for guidance."); *Regents of University of Minnesota v. AGA Medical Corp.*, 717 F.3d 929, 937-38 (Fed. Cir. 2013) (using dictionary definitions to show the "ordinary meaning" of "affix" and "conjoint"); *Phillips*, 415 F.3d at 1314 (observing that "general purpose dictionaries may be helpful" where construction "involves little more than the application of the widely accepted meaning of commonly understood words").

18

The other claims of the patents-in-suit confirm this understanding of the term's broad plain meaning.  Several dependent claims expressly restrict the "flexible element" to specific types of structures.  For example, dependent claim 17 expressly limits the "flexible element" to a coil:

> 17. The pressure sensor apparatus of claim 1, wherein the first flexible element is a coil.

(A28 at 12:59-60*; see also* A29-30 at 14:14-15, 15:38-39 (claims 37 & 60); A45-46 at 12:28-29, 14:14-15 (claims 4 & 30).)  "[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1314.  Therefore, claim differentiation strongly suggests that the term "flexible element" itself is broader and includes more than a coil—otherwise, claim 17 would be superfluous.  "Where, as here, the sole difference between the independent claim and the dependent claims is the limitation that one party is trying to read into the independent claim, the doctrine of claim differentiation is at its strongest." *SanDisk Corp. v. Kingston Tech. Co., Inc.*, 695 F.3d 1348, 1361 (Fed. Cir. 2012).  That describes this case to a tee.

Moreover, other dependent claims confirm the breadth of the "flexible element" term.  Claims 16 and 18 require a pressure sensor apparatus "wherein the first flexible element is a hypotube formed of a plastic material" (claim 16) or "comprises a balloon" (claim 18).  (A28 at 12:56-63.)  So the term "flexible element" must include both a plastic tube and a balloon because independent claim 1 must

19

include all the embodiments covered by dependent claims 16 and 18. *See* 35 U.S.C.
§ 112(d); *Alcon Research Ltd. v. Apotex, Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012) ("It is
axiomatic that a dependent claim cannot be broader than the claim from which it
depends."). Neither a plastic hypotube nor a balloon is literally the same as a coil, and
thus, the term "flexible element" cannot be construed to limit it to a coil, because
otherwise claims 16 and 18 could not properly depend from claim 1. In other words,
the district court's construction renders claims 16 and 18 invalid under 35 U.S.C.
§ 112(d), which is yet another reason to reject it. *Bayer CropScience AG v. Dow
AgroSciences LLC*, 728 F.3d 1324, 1331 (Fed. Cir. 2013) ("[T]he significant invalidity
troubles that accompany Bayer's construction substantiate our rejection of it.").

　　The claims of Volcano's other patents in the family further reinforce the
breadth of the "flexible element" term. Volcano wrote plenty of claims that explicitly
referenced a first and second "coil." (*See, e.g.,* A1501, A1516, A1530.) The fact that
the current claims use the broader term "flexible element" rather than the narrower
term "coil" strongly suggests that the terms are not coextensive. *See, e.g., Board of
Regents of the Univ. of Texas Sys. v. Benq Am. Corp.*, 533 F.3d 1362, 1371 ("Different
claim terms are presumed to have different meanings."). The inventors knew how to
claim a "coil," and they chose a term with a broader plain meaning in the claims of the
patents-in-suit to secure broader protection for their invention. It is inappropriate to
negate that choice under the guise of claim construction where, as here, there was
neither lexicography nor disavowal. *Thorner*, 669 F.3d at 1365.

The specification is also consistent with this understanding of the broad plain meaning of the term "flexible element." The examples of the "flexible element" in the specification—two coils—are both structures that are easily bent, and the specification explains that the purpose of the coils is to provide flexibility: "[t]he use of the two coils 46 and 54 on opposite sides of the housing [51] provides a very flexible floppy tip for the guide wire." (A24 at 4:17-19.) The specification never suggests that the invention is limited to only a two-coil arrangement. Quite the contrary: it describes the part of the guidewire with two coils as "substantially conventional" and acknowledges it was known in the prior art. (A24 at 4:49-50, 4:17-19.) Those disclosures signal to the skilled artisan that the details of that part of the guidewire are unimportant and that any flexible element will do, coil or otherwise. Indeed, it makes perfect sense for the specification to give one "conventional" example of how to accomplish the desired flexibility (*i.e.*, a coil) while using a broader term with a broader meaning in the claims.

The PTO's treatment of the claims confirms that the plain meaning of "flexible element" is not limited to a coil. The PTO's restriction requirement shows that the examiner understood the term "flexible element" to include a hypotube, a coil, and a balloon. (A782.) The PTO said that these items were "mutually exclusive," so it could not have issued the restriction if it thought the "flexible element" were limited to a coil. (*Id.*) Moreover, the fact that the PTO issued dependent claims requiring a "flexible element" that is a plastic hypotube counsels against a construction restricting

21

a "flexible element" to a coil.  The PTO is presumed to have done its job correctly, not to have issued dependent claims that are facially invalid under § 112(d), as the district court's construction would require.  *Am. Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed. Cir. 1984).

Finally, to the extent the Court finds it helpful, extrinsic evidence suggests a broad plain meaning for "flexible element" that is not limited to a coil.  Some of St. Jude's own patents have used the terms "elongate flexible element" or "elongated flexible member" to refer to non-coil structures that are easily bent.  (A1400-11; A1413-30; A1432-43; A1445-46.)  Moreover, other district court cases to have dealt with similar terms have given them their commonly understood meaning.  *See, e.g., ICU Med., Inc. v. B. Braun Med., Inc.*, 344 F. Supp. 2d 663, 669-69 (N.D. Cal. 2004) (relying on the same general purpose dictionary definition to construe "flexible element" that Volcano offers in this case); *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l, LLC*, 2007 WL 4105832, at *5 (N.D. Cal. Nov. 16, 2007) (Alsup, J.) (holding that "flexible member" did not need construction because "the plain language of the term itself is sufficient" and it could be given "its commonly understood meaning"); *cf. Thorner*, 669 F.3d at 1369 (construing the term "flexible pad" to mean a pad "capable of being flexed" and rejected a limiting construction even though all the embodiments were limited to foam).  This evidence reinforces the fact that the term "flexible element" does have a plain meaning to the skilled artisan (and everyone else for that matter) that is broader than only a coil.

### 2.    The District Court Erred in Concluding That "Flexible Element" Does Not Have a Plain Meaning.

The district court erred when it concluded, despite the evidence above, that "[f]lexible element does not have a previous meaning in the art to one of ordinary skill." (A9.) This mistake then led the district court into the further error of using the specification to define (and thus limit) the term, even though this Court has warned against such an approach. *See, e.g., Aria Diagnostics*, 726 F.3d at 1301 ("[E]ven if a specification has only one embodiment, its claims will not be confined to that example "unless the patentee has demonstrated a clear intention to limit the claim scope using words or expression of manifest exclusion or restriction.").

Neither of the district court's two proffered reasons for concluding that "flexible element" does not have a plain meaning is correct. First, the district court erroneously declined to apply claim differentiation, reasoning that the parties here have been in litigation since 2010 and Volcano supposedly "seeks to use claim differentiation to expand the claim scope years after the patent was originally filed." (A9 n.3, *citing ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009).) But claim differentiation is not being used to "expand" anything—it is being used to confirm the broad plain meaning of "flexible element," and to show that it cannot be limited to a coil without rendering claim 17 superfluous and claims 16 and 18 invalid. Moreover, Volcano's patents have, since the very beginning, included claims that are not limited to a coil, unlike the patents in *ICU*. (*E.g.,* A1501, A1516.)

23

This Court's decision in *ICU* is also inapposite because it dealt with a term— "spike"—that the Court determined had a *narrow* plain meaning (requiring a pointed tip and a piercing function). *See* 558 F.3d at 1375-76. Here, by contrast, the term "flexible element" has a *broad* plain meaning, and claim differentiation comports with, and does not contradict, that broad meaning.

Second, the district court declined to look to the dictionary and the extrinsic evidence because "many of these examples do not relate to the field of art at issue in this case—pressure sensing guidewires." (*Id.*) This was incorrect. This Court's precedent endorses the use of the dictionary to construe commonly understood words like the term here. *See, e.g., Comaper*, 596 F.3d at 1348; *Regents of University of Minnesota v. AGA Medical Corp.*, 717 F.3d at 937-38; *Phillips*, 415 F.3d at 1314. These cases correctly recognize that the skilled artisan does not check her knowledge of ordinary English or her common sense at the door when she reads a patent. *Cf. KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."). In fact, the district court itself had previously correctly relied on a general purpose dictionary to conclude that the term "flexible element" conveyed sufficient structure to avoid means-plus-function treatment. (A7.) And the St. Jude patents as well as other cases that reference a "flexible element" or "flexible member," discussed above at p. 22, reinforce the term's breadth by showing that it is used to describe a broad class of structures in many fields. There is thus no reason to treat it differently here.

24

Finally, we note that St. Jude should not be able on appeal to rely on the conclusory declaration of its expert, Dr. William Durfee, that "flexible element" does not have a plain meaning. The district court, which previously had the opportunity to assess Dr. Dufee's credibility first-hand during two trials in the parties' 2010 lawsuit, elected not to rely on his declaration. And the court was right: Dr. Durfee's declaration is inconsistent with the common meaning of the term "flexible element" and the intrinsic evidence (like dependent claims 16-18) that reinforce that plain meaning. It is thus entitled to no weight for purposes of claim construction. *Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Similarly, a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.").

### B. The "Exceptions" for Lexicography and Disavowal Do Not Apply, So "Flexible Element" Must Carry Its Full Plain Meaning.

Because "flexible element" has a broad plain meaning that includes any structure that is easily bent and is not limited to a coil, it would be appropriate to narrow that meaning only if one of the two "exceptions" for lexicography or disavowal apply. *Thorner*, 669 F.3d at 1365. The district court did not invoke either exception, and it was right not to—neither applies to this case.

First, nothing in the intrinsic evidence rises to the level of lexicography, *i.e..*, a clear indication that the patentee has redefined the term "flexible element." "To act as its own lexicographer, a patentee must clearly set forth a definition of the disputed claim term other than its plain and ordinary meaning. It is not enough for a patentee to simply disclose a single embodiment or use a word in the same manner in all embodiments, the patentee must clearly express an intent to redefine the term." *Thorner,* 669 F.3d at 1365. The patents-in-suit set forth no special definition of the term "flexible element," much less define it to mean a "coil." Indeed, as the district court noted, the term "flexible element" does not appear in the specification. (A9.) So the specification could not have redefined it. There is also nothing in the prosecution history redefining the term, and the examiner's comments demonstrate that everyone understood the term to have a broad meaning that was not limited to a coil. (A782.) The fact that the only example of a "flexible element" in the specification is a coil is simply not enough to show a clear intent to redefine the term. *Id.* at 1368 ("[D]isclosing embodiments that all use the term the same way is not sufficient to redefine a claim term.").

Second, nothing in the intrinsic evidence constitutes a disavowal of any part of the broad plain meaning of "flexible element." "The standard for disavowal of claim scope is similarly exacting" to the standard for lexicography. *Thorner*, 669 F.3d at 1366. It is "not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into

claims; we do not redefine words.  Only the patentee can do that.  To constitute disclaimer, there must be a clear and unmistakable disclaimer." *Id.* at 1366-67.  No disclaimer, clear or otherwise, appears in the intrinsic record, and the district court did not identify one.  Instead, the district court's decision to adopt a narrow construction for "flexible element" was based on its view that the specification "discusses flexibility, but only in the context of a coil or pair of coils."  (A10.)  But that does not meet the exacting standard for disavowal and thus cannot be used to limit the claims. *Thorner*, 669 F.3d at 1366.

In fact, the patents-in-suit strongly suggest that the invention is not limited to a guidewire that uses two coils, as opposed to other flexible structures.  When describing the portion of the guidewire with the coils, the specification characterizes it as "substantially conventional" and cites an earlier patent to a guidewire using the two-coil arrangement.  (A24 at 4:49-50, 4:17-19.)  The bulk of the specification then describes the structure of the guidewire-mounted pressure sensor and its location in a housing with a cutout, where it is mounted such that the pressure-sensitive region does not contact the housing, as the key to the invention.  (*See, e.g.*, A18-26 at 4:50-8:56; Figs. 4-12.)  A skilled artisan would therefore understand there is nothing special about the two-coil arrangement itself, as opposed to one or two other flexible structures that work to isolate the sensor from bending forces.  And there is certainly nothing that would clearly and unmistakably disavow replacing one or both of the coils with another flexible structure.

For completeness, we note that St. Jude argued below that Volcano had made a disclaimer during the prosecution of the '965 patent, which is the parent to the patent-in-suit. The district court did not accept that argument, and it was right not to. The '965 patent claims did not contain the disputed term here ("flexible element") and instead expressly referenced a coil. So Volcano's statements about those claims are irrelevant to the construction of a term that they did not contain. *See, e.g., Saunders Group, Inc. v. Comfortrac, Inc.*, 492 F.3d 1326, 1333 (Fed. Cir. 2007) ("When the purported disclaimers are directed to specific claim terms that have been omitted or materially altered in subsequent applications (rather than to the invention itself), those disclaimers do not apply."), and cases cited there.

Moreover, Volcano did not actually rely on a two-coil structure, rather than two other flexible elements, to distinguish even the claims of the '965 parent patent. Nor could it have—as noted, the specification acknowledges that the two-coil structure was "substantially conventional" and already disclosed in an earlier patent of Volcano's predecessor. So there was no way to use the two-coil structure to distinguish prior art, which confirms that Volcano did not use it for that purpose.

* * *

The term "flexible element" should thus be construed to have its full plain meaning (*i.e.*, any structure that is easily bent) because the exceptions for lexicography and disavowal do not apply to this case.

28

### C.    St. Jude Cannot Obtain Affirmance on the Alternate Basis that "Flexible Element" is a Means-Plus-Function Term.

The district court correctly determined that the term "flexible element" is not a means-plus-function term, so St. Jude cannot defend the judgment on that ground. (A4-8.)  "[A] claim term that does not use 'means' will trigger the rebuttable presumption that § 112 ¶ 6 does not apply."  *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F. 3d 1354, 1358 (Fed. Cir. 2004).  "[T]he presumption flowing from the absence of the term 'means' is a strong one that is not readily overcome."  *Id.*

The strong presumption against subjecting "flexible element" to means-plus-function treatment is not overcome in this case.  (A6-8.)  As the district court rightly explained, "the claim language itself connotes sufficient structure" to the skilled artisan because it indicates "where the flexible element is located in the invention (between the long proximal hypotube and a short hypotube sensor housing), the size of the flexible element (diameter of 0.018" or less), and describes its physical properties (the flexible element is more flexible than the long hypotube)."  (A6.) Moreover, the court correctly held that "an element that is flexible ***does*** connote structure," citing a dictionary definition that shows as much.  (A7-8 (emphasis added).)  This Court should thus reject any attempt by St. Jude to argue on appeal that § 112(f) applies.

## II.    The Judgment of No Literal Infringement Cannot Stand under the Correct Claim Construction.

The parties stipulated to a judgment of no literal infringement based solely on the district court's erroneous construction of "flexible element." (A13-14; A1701-03.) Therefore, if this Court reverses the claim construction, it should also reverse the judgment of no literal infringement and remand for further proceedings under the correct claim construction. *See, e.g., Aventis Pharms., Inc. v. Amino Chems., Ltd.*, 715 F.3d 1363, 1377 (Fed. Cir. 2013) (reversing stipulated judgment of non-infringement after correcting the district court's overly narrow claim construction).

### CONCLUSION

For the reasons above, the Court should reverse and remand for further proceedings under the correct construction.

Dated: March 27, 2014                       Respectfully submitted,

                                            /s/ Craig E. Countryman
                                            Craig E. Countryman
                                            FISH & RICHARDSON P.C.
                                            12390 El Camino Real
                                            San Diego, CA 92130
                                            Telephone: (858) 678-5070
                                            Facsimile: (858) 678-5099

                                            *Attorney for Appellant,*
                                            Volcano Corporation

# ADDENDUM

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VOLCANO CORPORATION,<br><br>        Plaintiff and<br>        Counterclaim Defendant,<br><br>    v.<br><br>ST. JUDE MEDICAL,<br>CARDIOVASCULAR AND ABLATION<br>TECHNOLOGIES DIVISION, INC., ST.<br>JUDE MEDICAL, CARDIOLOGY<br>DIVISION, INC., ST. JUDE MEDICAL,<br>U.S. DIVISION, ST. JUDE MEDICAL S.C.,<br>INC., and ST. JUDE MEDICAL SYSTEMS<br>AB,<br><br>        Defendants and<br>        Counterclaim Plaintiffs. | Civil Action No. 13-687-RGA |

MEMORANDUM OPINION

Thomas Lee Halkowski, Esq., FISH & RICHARDSON, P.C., Wilmington, DE; Frank E.
Scherkenbach, Esq. (argued), FISH & RICHARDSON, P.C., Boston, MA; Todd G. Miller, Esq.,
FISH & RICHARDSON, P.C, San Diego, CA; Michael M. Rosen, Esq., FISH &
RICHARDSON, P.C, San Diego, CA; Ryan O'Connor, Esq., FISH & RICHARDSON, P.C, San
Diego, CA; Christina Brown-Marshall, Esq. (argued), FISH & RICHARDSON, P.C, Redwood
City, CA.

    Attorneys for Plaintiff and Counterclaim Defendant Volcano Corporation.

Steven J. Fineman, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, DE; John
Allcock, Esq. (argued), DLA PIPER LLP, New York, NY; Stuart Pollack, Esq. (argued), DLA
PIPER LLP, New York, NY; Nicholas F. Aldrich, Jr., Esq., DLA PIPER LLP, New York, NY;
Marc E. Miller, Esq., DLA PIPER LLP, New York, NY.

    Attorneys for Defendants and Counterclaim Plaintiffs St. Jude Medical, Cardiovascular
and Ablation Technologies Division, Inc., St. Jude Medical, Cardiology Division, Inc., St. Jude
Medical, U.S. Division, St. Jude Medical S.C., Inc. and St. Jude Medical Systems AB.

January , 2014

*Richard G. Andrews*

**ANDREWS, U.S. DISTRICT JUDGE:**

Pending before this Court is the issue of claim construction of one disputed term found in

U.S. Patent Nos. 8,419,647 ("'647 patent") and 8,419,648 ("'648 patent").[1]

## I. BACKGROUND

On April 16, 2013, Volcano filed a patent infringement action against St. Jude Medical,

Cardiovascular and Ablation Technologies Division, Inc., St. Jude Medical, Cardiology Division,

Inc., St. Jude Medical, U.S. Division, St. Jude Medical S.C., Inc. and St. Jude Medical Systems

AB. (D.I. 1). St. Jude convinced the Court that construction of a single term could be

dispositive of Volcano's literal infringement case (D.I. 16 at 7-10), and the Court, relying on this

representation, granted an early claim construction hearing for that lone term. (D.I. 27). The

Court has considered the Parties' Joint Claim Construction Brief (D.I. 51), appendix (D.I. 52),

and oral argument on November 18, 2013. (D.I. 53).

## II. LEGAL STANDARD

"It is a bedrock principle of patent law that the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312

(Fed. Cir. 2005) (en banc) (internal quotation marks omitted). "'[T]here is no magic formula or

catechism for conducting claim construction.' Instead, the court is free to attach the appropriate

weight to appropriate sources 'in light of the statutes and policies that inform patent law.'"

*SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *1 (D. Del. Sept. 4, 2013) (quoting *Phillips*,

415 F.3d at 1324). When construing patent claims, a matter of law, a court considers the literal

language of the claim, the patent specification, and the prosecution history. *Markman v.*

*Westview Instruments, Inc.*, 52 F.3d 967, 977-80 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370

---

[1] The '647 and '648 patents share a common specification. The disputed term is construed identically in both
patents.

2

(1996). Of these sources, "the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips*, 415 F.3d at 1315 (internal quotations and citations omitted).

Furthermore, "the words of a claim are generally given their ordinary and customary meaning . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to [an] ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314 (internal citations omitted).

A court may consider extrinsic evidence, which "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises," in order to assist the court in understanding the underlying technology, the meaning of terms to one skilled in the art and how the invention works. *Id.* at 1317-19 (internal quotation marks and citations omitted). However, extrinsic evidence is less reliable and less useful in claim construction than the patent and its prosecution history. *Id.*

Finally, "[a] claim construction is persuasive, not because it follows a certain rule, but because it defines terms in the context of the whole patent." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l*

3

*Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (internal quotation marks and citation omitted).

## III.  CONSTRUCTION OF DISPUTED TERMS

### A.  U.S. Patent Nos. 8,419,647 & 8,419,648

1. "flexible element"

*Plaintiff's proposed construction*: The term does not require construction, but if the Court chooses to construe the term, the Court should construe it to have its full ordinary and customary meaning.

*Defendant's proposed construction*: This is a means plus function limitation where the function is "providing flexibility" and the structure is a "coil spring."

*Court's construction*: "A coil."

Volcano contends that "flexible element" should be entitled to its full ordinary and customary meaning.  The full ordinary and customary meaning, according to Volcano, encompasses hypotubes, coils, and balloons, as found in claims 16-18, respectively.  In the alternative, Volcano proposes: "structure that is easily bent."  St. Jude, on the other hand, asserts several arguments that seek to narrow the term's scope.  These limiting arguments will be addressed in turn.

a.  "Flexible Element" Is Not Subject to Means-Plus-Function

The term "flexible element" is not properly construed as a means-plus-function limitation.  A claim term that does not contain the word "means" is presumptively not subject to § 112 ¶ 6 (now § 112(f)).  *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002).  The presumption "can be overcome if it is demonstrated that 'the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure

4

A4

for performing that function.'" *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (quoting *CCS Fitness*, 288 F.3d at 1369); *Mass. Inst. of Tech. & Elecs. for Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1354 (Fed. Cir. 2006) ("*MIT*") ("Claim language that further defines a generic term like 'mechanism' can sometimes add sufficient structure to avoid 112 ¶ 6."). This presumption "is a strong one that is not readily overcome." *Lighting World*, 382 F.3d at 1358. Even though a term might not bring a particular structure to mind, that is not dispositive and the court can look to the dictionary to see if the term is one that is "understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'"[2] *Id.* at 1360; *MIT*, 462 F.3d at 1354.

In *MIT*, for example, the Federal Circuit found that the term "colorant selection mechanism" is subject to § 112 ¶ 6. *See MIT*, 462 F.3d at 1354 (noting that patentee used "mechanism" and "means" as synonyms and that "[a]t least one dictionary definition equates mechanism with means"). Moreover, "colorant selection" was not defined in the specification, did not have a dictionary definition, and there was no showing that "colorant selection mechanism" would "connote sufficient structure" to one of ordinary skill in the art. *Id.* The Federal Circuit later relied on *MIT* in holding that a claim reciting a "mechanism for moving said finger" was subject to § 112 ¶ 6. *Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1095-97 (Fed. Cir. 2008). In addition to a dearth of structural context in the claim language, the "mechanism for moving said finger" also lacks an adjective that "endows the claimed 'mechanism' with a physical or structural component." *Id.* at 1096. Recognizing that the person having ordinary skill in the art ("PHOSITA") "would have no recourse but to turn to the []

---

[2] According to my dictionary, a "nonce word" is "a word coined and used for a single occasion."

patent's specification to derive a structural connotation for the generically claimed 'mechanism

for moving said finger,'" the court applied § 112 ¶ 6. *Id.* (hinting that inclusion of "a 'finger

displacement mechanism,' a 'lateral projection/retraction mechanism,' or even a 'clamping

finger actuator,'" in the patent would have provided sufficient structural support to permit the

court to delve into the PHOSITA's understanding of the term). In contrast, the Federal Circuit

held that "detent mechanism" was not subject to § 112 ¶ 6 because "the noun 'detent' denotes a

type of device with a generally understood meaning in the mechanical arts, even though the

definitions are expressed in functional terms." *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91

F.3d 1580, 1583 (Fed. Cir. 1996).

As recognized above, there is a strong presumption against applying § 112 ¶ 6 to

"flexible element" because the word "means" is not used in the claim language. Here, unlike in

*MIT* and *Welker Bearing*, that presumption cannot be overcome because the claim language itself

connotes sufficient structure to the PHOSITA. Claim 1 involves:

> [A] first flexible element, disposed near a distal portion of the long proximal
> hypotube, with an outer diameter of 0.018" or less and an increased flexibility
> relative to the long proximal hypotube; a short hypotube sensor housing disposed
> near a distal extremity of the first flexible element . . . .

'648 patent, claim 1. This tells the PHOSITA where the flexible element is located in the

invention (between the long proximal hypotube and a short hypotube sensor housing), the size of

the flexible element (diameter of 0.018" or less), and describes its physical properties (the

flexible element is more flexible than the long hypotube).

Other courts have construed "flexible element," although § 112(f) was not at issue. In

*ICU Medical*, the Northern District of California construed "flexible element" to mean "a portion

6

A6

of the valve that is capable of being bent, usually without breaking." *ICU Med., Inc. v. B. Braun Med., Inc.*, 2005 WL 588341, at *2 (N.D. Cal. Mar. 14, 2005). There, the claim recited:

> [A] flexible element positioned in said cavity movable between an uncompressed position . . . and a compressed position . . . said flexible element comprising a wall . . . an end fitting against a ring shaped support . . . a first external diameter . . . , a second external diameter in said main portion, said second diameter being smaller than said first diameter and said third diameter, and at least a portion of the outer surface of the wall of the flexible element . . . being tapered.

*Id.* Although § 112 ¶ 6 was not at issue in *ICU Medical*, St. Jude suggests that neither party advanced a means-plus-function argument because the claim language provided sufficient structure to avoid such a construction. (D.I. 51 at 18-19 ("The flexible element in *ICU* has structure because the '[c]laim language . . . further defines' the made-up term, 'add[ing] sufficient structure to avoid 112 ¶ 6.' Accordingly, neither party argued that 'flexible element' should be treated under § 112 ¶ 6 . . . .") (internal citation omitted)). Admittedly, the claim language at issue here does not contain as much structure, but the claim in *ICU Medical* likely provided more than enough structure because § 112 ¶ 6 was not even raised. Moreover, several key elements are present in both claims: location of the claimed element in the invention, relative dimensions of the claimed element, and a description of the claimed element's physical properties. *Compare* '648 patent, claim 1, *with ICU Med., Inc.*, 2005 WL 588341, at *2.

Additionally, although it might escape precise definition, an element that is flexible does connote structure. Random House Unabridged Dictionary defines "flexible" as "capable of being bent, usually without breaking; easily bent," "willing or disposed to yield; pliable," or "a flexible substance or material." RANDOM HOUSE UNABRIDGED DICTIONARY 733 (2d ed. 1987); *see also ICU Med., Inc. v. B Braun Med., Inc.*, 344 F. Supp. 2d 663, 668 (N.D. Cal. 2004). This alone is enough to distinguish the current case from *Welker Bearing* where no adjective

7

A7

conveying any "physical or structural component" was present. St. Jude's contention that being

flexible is the function of the element, not the definition, is not dispositive of Volcano's position.

*See Greenberg*, 91 F.3d at 1583 ("[T]he fact that a particular mechanism—here 'detent

mechanism'—is defined in functional terms is not sufficient to convert a claim element

containing that term into a 'means for performing a specified function' within the meaning of

section 112(6). Many devices take their names from the functions they perform."). Because

"flexible element" does not contain the word "means" and the term connotes sufficient structure

to a PHOSITA, the Defendants fail to overcome the presumption that "flexible element" is not a

means-plus-function term. Accordingly, § 112 ¶ 6 does not apply.

#### b. The Specification Limits "Flexible Element" to a Coil

Although the term "flexible element" does not fall within the ambit of § 112 ¶ 6 because

it is not simply a nonce word that conveys no structure, the exact structure intended by the

patentee would likely not be clear to the PHOSITA without consulting the specification. When

the '648 patent specification discusses flexibility, it is always in reference to a coil. Because the

Court believes that the patentees' invention was limited to the use of a coil, the term "flexible

element" is construed accordingly.

It is a well understood canon of patent law that limitations from the specification

generally should not be imported into the claim language, but "if a disputed term has 'no

previous meaning to those of ordinary skill in the prior art[,] its meaning, then, must be found

[elsewhere] in the patent.'" *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300

(Fed. Cir. 2004) (alterations in original); *see also E.I. du Pont de Nemours & Co. v. Phillips

Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) ("It is entirely proper to use the

specification to interpret what the patentee meant by a word or phrase in the claim."). According

to the Federal Circuit, the "construction that stays true to the claim language and most naturally

aligns with the patent's description of the invention will be, in the end, the correct construction."

*Renishaw PLC*, 158 F.3d at 1250 ("Ultimately, the interpretation to be given a term can only be

determined and confirmed with a full understanding of what the inventors actually invented and

intended to envelop with the claim.").

Flexible element does not have a previous meaning in the art to one of ordinary skill. To

support its contention that "flexible element" has a well understood meaning in the art, Volcano

points to dictionary definitions, other cases where the courts have construed the term, St. Jude's

own patents, other issued patents that use the term, and a Google search. (D.I. 51 at 29). The

dictionary definitions, other courts' constructions, previously issued patents and the Google

search are not persuasive because many of these examples do not relate to the field of art at issue

in this case—pressure-sensing guide wires. St. Jude's use of "flexible element" in its patents is

similarly unavailing because those patents recite an "elongate flexible element" or "elongated

flexible member." Both of these terms are understood to be a hypotube, which is distinct from

the "flexible element" at issue here. *See* '648 patent, 3:50-56.

The term "flexible element" does not appear in the specification itself. This is because

the specification is common to a family of related patents that date back to 1994, whereas the

'647 and '648 patents introduced the term into the claim language when those patents issued in

2013.[3]  At least one of the earlier patents that shares this specification claims a "coil" instead of a

---

[3] The parties in this case have been wielding their patent portfolios against one another in active litigation since the middle of 2010. (1:10-cv-631-RGA; 1:12-cv-441-RGA). Given the extensive litigation over the devices at issue, a claim differentiation argument regarding claims 16-18 of the '648 patent—dependent claims that cover a hypotube, coil, and balloon as further limitations to "flexible element"—is not persuasive. Claim differentiation "is not a rigid rule but rather is one of several claim construction tools." *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1376 (Fed. Cir. 2009). This is especially true when the patentee seeks to use claim differentiation to expand the claim scope years after the patent was originally filed. *See id.* (rejecting claim differentiation argument advanced by patentee where dependent claim "was only added to the [] patent in 2001, years after the filing date of the original

9

"flexible element." *See, e.g.*, U.S. Pat. No. 6,976,965, claim 1 ("A pressure sensor apparatus

comprising: a guidewire; . . . a *first coil* disposed proximally from the sensor housing . . . .")

(emphasis added). This suggests that a coil was understood to provide the claimed flexibility.

 The specification does reference a "flexible elongate element 41," or a "flexible elongate

member 41," and a "flexible elongate tubular member 173." *See* '648 patent, 3:51, 4:2-3, and

10:30. It also discusses flexibility, but only in the context of a coil or pair of coils. For example,

the specification states: "The use of two coils 46 and 54 on opposite ends of the housing 61

provides a very flexible floppy tip for the guide wire . . . ." *Id.* at 4:17-19. Indeed the claim

language requires a "flexible floppy tip" that comprises a short hypotube sensor housing

sandwiched between a first flexible element and second flexible element. *Id.* at claim 1. In other

words, the sensor housing and the two flexible elements comprise the flexible floppy tip. The

flexible floppy tip is located distal to the hypotube and therefore was not intended to include the

hypotube itself. *Id.* The figures and accompanying description reinforce that the flexible

element must be limited to a coil. Figures 2 and 3 depict both a "flexible elongate element 41,"

which the specification notes is "conventionally called a 'hypotube,'" as well as two coil springs

affixed to the distal portion of the elongate flexible element, thereby forming the flexible floppy

tip. *Id.* at 3:55-56. When the claim states a "first flexible element, *disposed near a distal portion*

*of the long proximal hypotube*," it is clearly informing the PHOSITA that it is not claiming the

hypotube itself as the first flexible element, but rather a structure that is distal to the "flexible

elongate member 41." *Id.* at claim 1 (emphasis added). That structure is the coil that forms a

part of the flexible floppy tip. When read in this light, the claim term "flexible element" cannot

be understood to be anything other than a coil. *See Renishaw PLC*, 158 F.3d at 1250 (relying on

---

patents . . . and the introduction of the allegedly infringing Alaris products" ). Here, "flexible element" was added
almost twenty years after the specification was drafted.

"full understanding of what the inventors actually invented and intended to envelop with the claim").

It is also difficult to believe, as Volcano argues, that a balloon can act as a flexible element within the meaning of the patents. Whenever the word balloon appears in the specification, it is described as being used to dilate a stenosis. *See, e.g.*, '648 patent, 8:8-11 ("[A]n angioplasty catheter having a balloon thereon (not shown) can be advanced over the guide wire 21 and advanced into the stenosis to dilate the stenosis."); *id.* at 10:26-29 (discussing "another embodiment of a guide wire" which carries "an integral balloon"); *id.* at 10:41-61 ("The balloon 176 is provided with a distal extremity which is closed and which is secured to the proximal extremity of a coil spring . . . . The flexible elongate tubular member 172 is provided with a balloon inflation lumen 187 which can be used for inflating and deflating the balloon 176."); *id.* at 11:32-37 ("[W]here desired, the guide wire can be provided with an integrally mounted balloon on its distal extremity so that the guide wire can be utilized for performing an angioplasty . . . ."). One of the older patents in the patent family even claims the balloon as a dilation tool. *See* U.S. Pat. No. 6,767,327, claim 8 ("The method of claim 1 further comprising the steps of: advancing an angioplasty catheter having a balloon thereon over the guide wire to the location of the stenosis, and dilating the stenosis with the balloon."). There is no mention of any other use for the balloon in the specification, let alone any statements suggesting that its inflatability makes it "more flexible than the elongate tubular member, which is not inflatable." (D.I. 51 at 37-38). Therefore, the claimed "flexible element" does not include a balloon and is limited to a coil.

11

A11

## IV. CONCLUSION

Within five days the parties shall submit a proposed order consistent with this

Memorandum Opinion suitable for submission to the jury.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| VOLCANO CORPORATION,<br><br>   Plaintiff,<br><br>  v.<br><br>ST. JUDE MEDICAL, CARDIOVASCULAR AND ABLATION TECHNOLOGIES DIVISION, INC.; ST. JUDE MEDICAL, CARDIOLOGY DIVISION, INC.; ST. JUDE MEDICAL, U.S. DIVISION; ST. JUDE MEDICAL S.C., INC.; and ST. JUDE SYSTEMS AB,<br><br>   Defendants. | C.A. No. 13-687-RGA |

### [~~PROPOSED~~] FINAL JUDGMENT

Pursuant to the Stipulation and Joint Motion for Entry of Final Judgment, final judgment is hereby entered as follows:

  1. Judgment in favor of Defendants and against Plaintiff Volcano Corporation that Defendants do not infringe the asserted claims of U.S. Patent Nos. 8,419,647 and 8,419,648, either literally or under the doctrine of equivalents, pursuant to the doctrine of collateral estoppel, and

  2. All of Defendants' defenses and counterclaims are dismissed without prejudice as moot.

  3. The parties shall bear their own costs and attorneys' fees accrued up through the date of this Order as to all claims, defenses, and counterclaims asserted in this action.

IT IS SO ORDERED this ___17th___ day of ___March_____, 2014.

The Honorable Richard G. Andrews
United States District Court Judge

2

A14



US008419648B2

(12) **United States Patent**           (10) **Patent No.:**    **US 8,419,648 B2**
Corl et al.                                (45) **Date of Patent:**    **Apr. 16, 2013**

(54) **ULTRA MINIATURE PRESSURE SENSOR**

(75) Inventors: **Paul Corl**, Palo Alto, CA (US); **Robert Obara**, Sunnyvale, CA (US); **John Ortiz**, East Palo Alto, CA (US)

(73) Assignee: **Volcano Corporation**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 130 days.

(21) Appl. No.: **11/303,249**

(22) Filed: **Dec. 15, 2005**

(65) **Prior Publication Data**

US 2006/0094982 A1    May 4, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 10/247,043, filed on Sep. 19, 2002, now Pat. No. 6,976,965, which is a continuation of application No. 09/644,111, filed on Aug. 21, 2000, now Pat. No. 6,767,327, which is a continuation of application No. 08/912,879, filed on Aug. 15, 1997, now Pat. No. 6,106,476, which is a continuation-in-part of application No. 08/710,062, filed on Sep. 9, 1996, now Pat. No. 5,715,827, which is a continuation of application No. 08/300,445, filed on Sep. 2, 1994, now abandoned.

(51) **Int. Cl.**
*A61B 5/02*        (2006.01)
(52) **U.S. Cl.**
USPC .......................................... **600/486**; 600/485
(58) **Field of Classification Search** .................. 600/300, 600/481, 485–489, 500
See application file for complete search history.

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,490,441 A | 1/1970 | Curtis | |
| 3,545,275 A | 12/1970 | Harrison | |
| 3,724,274 A | 4/1973 | Millar | |
| 3,748,623 A | 7/1973 | Millar | |
| 4,020,830 A | 5/1977 | Johnson et al. | |
| 4,274,423 A * | 6/1981 | Mizuno et al. | 600/488 |
| 4,554,927 A | 11/1985 | Fussell | |
| 4,610,256 A | 9/1986 | Wallace | |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 2246687 | 3/1974 |
| DE | 2708607 | 2/1977 |

(Continued)

OTHER PUBLICATIONS

Chau, Hin-Leung, "An Ultraminiature Solid-State Pressure Sensor for a Cardiovascular Catheter," Abstract of Electron Devices, IEEE Transactions, vol. 35, issue 12, Dec. 1988.

*Primary Examiner* — Patricia Mallari
*Assistant Examiner* — Michael D'Angelo
(74) *Attorney, Agent, or Firm* — Haynes and Boone, LLP

(57)                    **ABSTRACT**

A method of measuring blood pressure and velocity proximally and distally of a stenosis in a vessel carrying blood includes the steps of providing a guide wire having both a pressure sensor and a velocity sensor disposed on a distal region of the guide wire, introducing the guide wire into the vessel, advancing the guide wire to position the pressure sensor and the velocity sensor proximally and distally of the stenosis, and measuring the blood pressure and velocity proximally and distally of the stenosis with the pressure sensor and the velocity sensor.

**75 Claims, 6 Drawing Sheets**



**US 8,419,648 B2**

Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,659,235 A | * | 4/1987 | Gilmore et al. | 374/143 |
| 4,722,348 A | | 2/1988 | Ligtenberg et al. | |
| 4,733,669 A | | 3/1988 | Segal | |
| 4,748,986 A | * | 6/1988 | Morrison et al. | 600/585 |
| 4,771,782 A | | 9/1988 | Millar | |
| 4,807,477 A | * | 2/1989 | Myers et al. | 73/708 |
| 4,808,164 A | | 2/1989 | Hess | |
| 4,815,472 A | | 3/1989 | Wise et al. | |
| 4,872,483 A | * | 10/1989 | Shah | 137/557 |
| 4,881,410 A | | 11/1989 | Wise et al. | |
| 4,901,735 A | | 2/1990 | von Berg | |
| 4,908,693 A | * | 3/1990 | Nishiguchi | 257/417 |
| 4,945,762 A | * | 8/1990 | Adamic, Jr. | 73/862.622 |
| 4,953,553 A | | 9/1990 | Tremulis | |
| 4,964,409 A | * | 10/1990 | Tremulis | 600/434 |
| 5,013,396 A | | 5/1991 | Wise et al. | |
| 5,046,497 A | | 9/1991 | Millar | |
| 5,050,297 A | | 9/1991 | Metzger | |
| 5,050,606 A | | 9/1991 | Tremulis | |
| 5,067,491 A | | 11/1991 | Taylor et al. | |
| 5,085,223 A | | 2/1992 | Lars et al. | |
| 5,113,868 A | * | 5/1992 | Wise et al. | 600/488 |
| 5,125,137 A | | 6/1992 | Corl et al. | |
| 5,163,445 A | | 11/1992 | Christian et al. | |
| 5,174,295 A | | 12/1992 | Christian et al. | |
| 5,178,153 A | | 1/1993 | Einzig | |
| 5,178,159 A | | 1/1993 | Christian | |
| 5,207,102 A | | 5/1993 | Takahashi et al. | |
| 5,207,103 A | | 5/1993 | Wise et al. | |
| 5,226,421 A | | 7/1993 | Frisbie et al. | |
| 5,226,423 A | | 7/1993 | Tenerz et al. | |
| 5,240,437 A | | 8/1993 | Christian | |
| 5,313,957 A | | 5/1994 | Little | |
| 5,348,481 A | | 9/1994 | Ortiz | |
| 5,358,409 A | | 10/1994 | Obara | |
| 5,412,994 A | | 5/1995 | Cook et al. | |
| 5,450,091 A | | 9/1995 | Hama | |
| 5,450,853 A | | 9/1995 | Hastings | |
| 5,517,989 A | | 5/1996 | Frisbie et al. | |
| 5,551,301 A | | 9/1996 | Cowan | |
| 5,668,320 A | | 9/1997 | Cowan | |
| 5,715,827 A | | 2/1998 | Corl et al. | |
| 5,807,477 A | | 9/1998 | Hearn et al. | |
| 5,902,248 A | | 5/1999 | Millar et al. | |
| 6,106,476 A | | 8/2000 | Corl et al. | |
| 6,112,598 A | | 9/2000 | Tenerz et al. | |
| 6,142,958 A | | 11/2000 | Hammarstrom et al. | |
| 6,167,763 B1 | | 1/2001 | Tenerz et al. | |
| 6,976,965 B2 | | 12/2005 | Corl et al. | |
| 7,033,325 B1 | | 4/2006 | Sullivan | |
| 7,097,620 B2 | | 8/2006 | Corl et al. | |
| 2006/0074318 A1 | | 4/2006 | Ahmed et al. | |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0006577 | 6/1979 |
| EP | 0036171 | 3/1981 |
| EP | 0115548 | 8/1984 |
| EP | 0215528 | 9/1986 |
| EP | 0224997 | 9/1986 |
| EP | 0313836 | 5/1989 |
| EP | 0387453 | 12/1989 |
| WO | WO8103613 | 12/1981 |
| WO | WO 88/00810 | 2/1988 |
| WO | WO 90/06722 | 6/1990 |
| WO | WO 90/07906 | 7/1990 |
| WO | WO 97/00641 | 1/1997 |

### OTHER PUBLICATIONS

Chau, Hin-Leung, "An Ultraminiature Solid-State Pressure Sensor for a Cardiovascular Catheter," Transducers 1987.

Ko et al., "Development of a Miniature Pressure Transducer for Biomedical Applications," (IEEE Transactions on Electron Devices, vol. ED-26 1979), 10 pages.

Non-Final Office Action issued in U.S. Appl. No. 11/650,064, mailed Jun. 4, 2010, 11 pages.

Non-Final Office Action issued in U.S. Appl. No. 10/247,043; mailed Jun. 17, 2004; 11 pages.

Non-Final Office Action issued in U.S. Appl. No. 13/169,174; mailed Jun. 20, 2012; 9 pages.

Final Office Action issued in U.S. Appl. No. 10/247,043; mailed Mar. 23, 2005; 9 pages.

Final Office Action issued in U.S. Appl. No. 10/247,043; mailed Jul. 1, 2005; 9 pages.

Non-Final Office Action issued in abandoned U.S. Appl. No. 11/442,684; mailed Oct. 3, 2007, 6 pages.

Esashi, M., et al., "Fabrication of Catheter-Tip and Sidewall Miniature Pressure Sensor," IEEE Transactions on Electron Devices, vol. ED-29, No. 1, Jan. 1982, pp. 57-63.

European Search Report, EPO, for EP Application No. 83100989.9, Publication No. 0115548, Search completed Aug. 29, 1983.

European Supplementary Search Report, EPO, for EP Application No. 95928311, Publication No. 0778746, Search completed Sep. 3, 1997.

European Search Report, EPO, for EP Application No. 06075026, Publication No. 1658808, Search completed Mar. 17, 2006.

Ji,, Jin, et al., An Ultraminiature CMOS Pressure Sensor for a Multiplexed Cardiovascular Catheter, IEEE Transactions, vol. 39, No. 10, Oct. 1992.

Wallis, George, et al., Field Assisted GlassMetal Sealing, AIP Journal of Applied Physics, Citation: J. Appl. Phys. 40, 3946 (1969); DOI: 10.1063/1/1657121.

Terry, Stephen C. et al., A Gas Chromatographic Air Analyzer Fabricated on a Silicon Wafer, IEEE Transactions, Jul. 30, 1979.

Roylance, Lynn Michelle, et al., A Batch-Fabricated Silicon Accelerometer, IEEE Transactions, vol. ED-26, No. 12, Dec. 1979.

Peterson, Kurt E. , Silicon as a Mechanical Material, Proceedings of the IEEE, vol. 70, No. 5, May 1982.

Sander, Craig S., et al., A Monolithic Capacitive Pressure Sensor With Pulse-Period Output, IEEE Transactions, vol. ED-27, No. 5, May 1980.

Tufte, O.N., et al., Silicon Diffused-Element Piezoresistive Diaphragms, Journal of Applied Physics, vol. 33, No. 11, Nov. 1962.

Tufte, O.N., et al. Piezoresistive Properties of Silicon Diffused Layers, Citation: J. Appl. Phys. 24, 313 (1963); doi: 10/1063/1.1702605.

Kanda, Yozo, A Graphical Representation of the Piezoresistance Coefficients in Silicon, IEEE Transactions, vol. ED-29, No. 1, Jan. 1982.

Guckel, H. et al., Laser-Recrystallized Piezoresistive Micro-Diaphragm Sensor, IEEE Transactions, 1985.

Sridhar, Uppili, et al., Temperature Coefficient of Resistance of Piezoresistors, IEEE Transactions, 1992.

Chau, K.H.-L., et al., High-Stress and Overrange Behavior of Sealed-Cavity Polysilicon Pressure Sensors, IEEE Transactions, 1990.

Sugiyama, Susumu, et al., Surface Micromachined Micro-Diaphragm Pressure Sensors, IEEE Transactions, 1991.

Samaun, et al., An IC Piezoresistive Pressure Sensor for Biomedical Instrumentation, May 1972.

Clark, Samuel K., et al. Pressure Sensitivity in Anisotropically Etched Thin-Diaphragm Pressure Sensors, IEEE Transactions, vol. ED-26, No. 12, Dec. 1979.

Timoshenko, S., et al., Theory of Plates and Shells, McGraw-Hill Book Company, 1959.

Lee, Ki-Won, et al., SENSIM: A Simulation Program for Solid-State Pressure Sensors, IEEE Transactions, vol. ED-29, No. 1, Jan. 1982.

Maseeh, Fariborz, et al., A CAD Architecture for Microelectromechanical Systems, IEEE Transactions, 1990.

Senturia, Stephen D., et al., A Computer-Aided Design System for Microelectromechanical Systems (MEMCAD), IEEE, Journal of Microelectromechanical Systems, vol. 1, No. 1, Mar. 1992.

Zhang, Y., et al., Pressure Sensor Design and Simulation Using the Caemens-D Module, Center for Integrated Sensors and Circuits, University of Michical, IEEE Transactions, 1990.

Huang, J.C.-M., et al., A Monolithic Pressure-pH Sensor for Esophageal Studies, Departmetn of Electrical and Computer Engineering, University of Michigan, IEEE Transactions, 1982.

Lee, Yong S., et al., A Batch-Fabricated Silicon Capacitive Pressure Transducer with Low Temperature Sensitivity, IEEE Transactions, vol. ED-29, No. 1, Jan. 1982.

Chau, Hin-Leung, Scaling Limits in Batch-Fabricated Silicon Pressure Sensors, IEEE Transactions, vol. ED-34, No. 4, Apr. 1987.

* cited by examiner









FIG_11

FIG_10

FIG_9

FIG_12



FIG_13

FIG_14

FIG_15



US 8,419,648 B2

**1**

# ULTRA MINIATURE PRESSURE SENSOR

## CROSS-REFERENCE TO RELATED APPLICATION

This is a continuation of U.S. application Ser. No. 10/247,043, filed Sep. 19, 2002, now U.S. Pat. No. 6,976,965, which is a continuation of U.S. application Ser. No. 09/644,111, filed Aug. 21, 2000, now U.S. Pat. No. 6,767,327, which is a continuation of U.S. application Ser. No. 08/912,879, filed Aug. 15, 1997, now U.S. Pat. No. 6,106,476, which is a continuation-in-part of U.S. application Ser. No. 08/710,062, filed Sep. 9, 1996, now U.S. Pat. No. 5,715,827, which is a continuation of U.S. application Ser. No. 08/300,445, filed Sep. 2, 1994, now abandoned, all of which are hereby expressly incorporated by reference in their entirety.

## FIELD OF THE INVENTION

This invention relates to an ultra miniature pressure sensor and guide wire and apparatus using the same and method, which is particularly suitable for making pressure measurements in coronary arteries of human beings.

It has been well known that it is desirable to make pressure measurements in vessels and particularly in coronary arteries with the advent of angioplasty. Typically in the past, such pressure measurements have been made by measuring the pressure at a proximal extremity of a lumen provided in a catheter advanced into the coronary artery of interest. However, such an approach has been less efficacious as the diameters of the catheters became smaller with the need to advance the catheter into smaller vessels. This made necessary the use of smaller lumens which gave less accurate pressure measurements and in the smallest catheters necessitated the elimination of such a pressure lumen entirely. In an attempt to overcome these difficulties, ultra miniature pressure sensors have been proposed for use on the distal extremities of catheters. However, it has not been feasible prior to the present invention to provide such ultra miniature pressure sensors which are capable of being incorporated in a guide wire for making pressure measurements in a very small arterial vessels. There is therefore a need for a new and improved ultra miniature pressure sensor and a guide wire and apparatus utilizing the same.

In general it is an object of the present invention to provide an ultra miniature pressure sensor and guide wire and apparatus utilizing the same making possible pressure and velocity measurements.

Another object of the invention is to provide a sensor which can be utilized on the distal extremity of a guide wire 0.018" or 0.014" in diameter.

Another object of the invention is to provide a sensor of the above character which is formed of a silicon chip of a small dimension which is reinforced by an additional member to provide reinforcement for the chip.

Another object of the invention is to provide a sensor of the above character in which a thin diaphragm is formed in the crystalline silicon chip.

Another object of the invention is to provide a sensor of the above character in which the reinforcing member extends for approximately 200 microns beyond the silicon diaphragm.

Another object of the invention is to provide a guide wire with the above character in which the number of conducting wires required is kept to a minimum.

Another object of the invention is to provide a guide wire and method in which simultaneous pressure and velocity measurements can be made.

**2**

Another object of the invention is to provide a guide wire of the above character in which the diaphragm area has been maximized.

Another object of the invention is to provide a guide wire with the above character in which two pressure sensors are provided on the guide wire which are spaced apart so that pressure measurements can be made on both sides of a stenosis.

Another object of the invention is to provide a guide wire of the above character in which the sensors are covered to prevent the formation of blood clots.

Another object of the invention is to provide an apparatus of the above character which includes a guide wire with an integral inflatable balloon.

Another object of the invention is to provide an apparatus of the above character in which temperature compensation can be provided.

Another object of the invention is to provide an apparatus of the above character which can be utilized in a half-bridge configuration.

Additional features and objects of the invention will appear from the following description in which the preferred embodiments are set forth in detail in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a schematic illustration showing use of a guide wire incorporating a pressure sensor of the present invention and apparatus utilizing the same in conjunction with a patient undergoing a catheterization procedure for diagnosis or treatment.

FIG. **2** is a side elevational view of a guide wire incorporating an ultra miniature pressure sensor of the present invention.

FIG. **3** is an enlarged side elevational view of the distal extremity of the guide wire shown in FIG. **2** and showing the pressure sensor mounted therein.

FIG. **4** is a top plan view looking along the line **4-4** of FIG. **3**.

FIG. **5** is a bottom plan view looking along the line **5-5** of FIG. **3**.

FIG. **6** is an isometric view of the pressure sensor shown in FIGS. **3**, **4** and **5** with the lead wires connected thereto.

FIG. **7** is a side elevational view of the pressure sensor shown in FIG. **6**.

FIG. **8** is a top plan view of the pressure sensor shown in FIGS. **6** and **7**.

FIG. **9** is a cross-sectional view taken along the line **9-9** of FIG. **8**.

FIG. **10** is a cross-sectional view taken along the line **10-10** of FIG. **8**.

FIG. **11** is a cross-sectional view taken along the line **11-11** of FIG. **8**.

FIG. **12**, is a schematic diagram of the circuitry utilized in the pressure sensor shown in FIGS. **6-11**.

FIG. **13** is a side elevational view of the distal extremity of another guide wire incorporating the pressure sensor with the sensor of the present invention being mounted in the tip housing.

FIG. **14** is a side elevational view of the distal extremity of a guide wire having first and second pressure sensors mounted in the distal extremity of the same spaced apart to permit simultaneous measurements of proximal and distal pressures with respect to a stenosis.

**3**

FIG. **15** is a partial side elevational view of another guide wire incorporating the present invention with an enclosed pressure sensor.

FIG. **16** is a side elevational view partially in section of the distal extremity of another guide wire incorporating the present invention in which the pressure sensor is enclosed in a transition housing.

FIG. **16**A is a side elevational view in section showing an end-mounted pressure sensor incorporating the present invention.

FIG. **17** is a side elevational view in section of a guide wire housing a tip-mounted sensor incorporating the present invention with an integral balloon.

DETAILED DESCRIPTION OF THE INVENTION

In general, the guide wire of the present invention having pressure sensing capabilities is comprised of a flexible elongate element having proximal and distal extremities and having a diameter of 0.018″ and less. The pressure sensor is mounted on the distal extremity of a flexible elongate element. It is comprised of a crystal semiconductor material having a recess therein and forming a diaphragm bordered by a rim. A reinforcing member is bonded to the crystal and reinforces the rim of the crystal and has a cavity therein underlying the diaphragm and exposed to the diaphragm. A resistor having opposite ends is carried by the crystal and has a portion thereof overlying a portion of the diaphragm. Leads are connected to opposite ends of the resistor and extend within the flexible elongate member to the proximal extremity of the flexible elongate member.

More in particular, the guide wire **21** of the present invention having pressure measuring capabilities as shown in FIG. **1** is one that is adapted to be used in connection with a patient **22** lying on a table or a bed **23** in a cath lab of a typical hospital in which a catheterization procedure such as for diagnosis or treatment is being performed on the patient. The guide wire **21** is used with apparatus **24** which consists of a cable **26** which connects the guide wire **21** to an interface box **27**. Interface box **27** is connected by another cable **28** to a control console **29** which has incorporated as a part thereof a video screen **31** on which a waveform **32** displaying ECG measurements may be provided as well as two traces **33** and **34** displaying pressure measurements being made by the guide wire **21**.

The guide wire **21** is shown more in detail in FIG. **2** and as shown therein, the guide wire **21** can be constructed utilizing the various constructions as shown in U.S. Pat. Nos. 5,125, 137; 5,163,445; 5,174,295; 5,178,159; 5,226,421; and 5,240, 437. As disclosed therein, such a guide wire consists of a flexible elongate element **41** having a proximal and distal extremities **42** and **43** and which can be formed of a suitable material such as stainless steel having an outside diameter for example of 0.018″ or less and having a suitable wall thickness as for example, 0.001″ to 0.002″ and conventionally called a "hypotube" having a length of 150-170 centimeters. Where a smaller guide wire is desired, the hypotube **41** can have an exterior diameter of 0.014″ or less. Typically such a guide wire includes a core wire (not shown) of the type disclosed in the above identified patents which extends from the proximal extremity to the distal extremity of the flexible elongate element **41** to provide the desired torsional properties for guide wires (See U.S. Pat. No. 5,163,445, col. 18:40-51) to facilitate steering of the guide wire 21 in the vessel.

A coil spring **46** is provided and is formed of a suitable material such as stainless steel. It has an outside diameter of 0.018″ and is formed from a wire having a diameter of 0.003″.

**4**

The spring **46** is provided with a proximal extremity **47** which is threaded onto the distal extremity **43** of the flexible elongate member **41**. The distal extremity **48** of the coil spring **46** is threaded onto the proximal extremity **49** of an intermediate or transition housing **51** such as disclosed in U.S. Pat. No. 5,174,295, formed of a suitable material such as stainless steel having an outside diameter of 0.018″ and having a suitable wall thickness as for example, 0.001″ to 0.002″. The housing **51** is provided with a distal extremity **52** which has the proximal extremity **53** of a coil spring **54** threaded thereon. The coil spring **54** is formed of a highly radiopaque material such as palladium or a tungsten platinum alloy. The coil spring **46** can have a suitable length as for example **27** centimeters whereas, the coil spring **54** can have a suitable length such as 3 centimeters. The intermediate or transition housing **51** can have a suitable length as for example, one to five millimeters. The use of the two coils **46** and **54** on opposite ends of the housing **51** provides a very flexible floppy tip for the guide wire **21** as described in U.S. Pat. No. 5,174,295. The coil **54** is provided with a distal extremity which is threaded onto an end cap **57** also formed of a suitable material such as stainless steel and having an outside diameter of 0.018″ and a wall thickness of 0.001″ to 0.002″. An ultrasonic transducer **58** is mounted in the end cap in a manner described in U.S. Pat. No. 5,125,137 and has conductors **61** and **62** secured to the front and rear sides of the same which extend interiorly to the proximal extremity of the flexible elongate member **41**.

A torquer **66** of the type described in U.S. Pat. No. 5,178, 159 is mounted on the proximal extremity **42** of the flexible elongate member **41** for causing a rotation of a guide wire **21** when used in connection with catheterization procedures in a manner well known to those skilled in the art.

The proximal extremity **42** is also provided with a plurality of conducting sleeves (not shown) of the type disclosed in U.S. Pat. No. 5,178,159. In the present invention, one or more additional sleeves can be provided to make connection to the conductors hereinafter described. The proximal extremity **42** of the flexible elongate member is removably disposed within a housing **68** of the type described in U.S. Pat. No. 5,178, 159, 5,348,481 and 5,358,409 that makes electrical contact with the sleeves on the proximal extremity **42** while permitting rotation of the sleeves and the flexible elongate member **41**. The housing **68** carries female receptacles (not shown) which receive the sleeves and which are connected to a cable **71** connected to a connector **72**. The connector **72** is connected to another mating connector **73** carried by the cable **26** and connected into the interface box **27**.

The portion of the guide wire **21** therefore described is substantially conventional. In accordance with the present invention it is provided with a pressure measuring capability in the form of a pressure sensor assembly **76** which is mounted within the intermediate or transition housing **51**. The pressure sensor assembly **76** consists of a diaphragm structure **77** supported by a base plate **78**. The diaphragm structure **77** is formed of suitable materials such as "n" type or "p" type **100** oriented silicon with a resistivity of approximately 6-8 ohm-centimeters. The diaphragm structure **77** is a die made from such a wafer. In accordance with the present invention, the die has a suitable length, as for example, 1050 microns and for a 0.014″ guide wire has a width of 250 microns and for a 0.018″ guide wire has a width of between 250 and 350 microns. It can have a suitable thickness, as for example, 50 microns. A rectangular diaphragm **79** is formed in the diaphragm structure **77** of a suitable thickness, as for example, 2.5 microns and having dimensions such as a length of 350 microns. The diaphragm **79** has first and second or top

US 8,419,648 B2

5                                                                                      6

and bottom surfaces 80 and 81. The diaphragm is formed by utilization of conventional masking and crystal etching techniques which create a die with two parallel sloping endwalls 82 and two parallel sidewalls 83 extending at right angles to the end walls 82 leading down to the top surface 80 of the diaphragm 79 to form a well 84. As hereinafter explained, the diaphragm 79 is made relatively wide in comparison to the diaphragm structure 77 so that what remains is a relatively narrow rim 86 formed by side portions 87 and 88 and an end portion 89. As can be seen from FIGS. 6, 7 and 8, the diaphragm 79 is located at or near one end of the diaphragm structure or die 77. It has been found that it is desirable to provide a rectangular geometry for the diaphragm 79 rather than a square geometry in order to obtain the highest possible sensitivity for pressure measurements. For example, it has been found that the rectangular diaphragm provides approximately 1.5 times more sensitivity than does a square diaphragm for the same diaphragm thickness and width.

In etching the well 84 to form the diaphragm 81, an impurity can be implanted into the backside of the diaphragm structure 77 before the etching process is commenced so that etching will stop at the desired depth, as for example, within 2 to 3 microns of the bottom surface 81 to provide a diaphragm 79 having a thickness ranging from 2 to 5 microns, and for example, the preferred thickness of 2.5 microns. Because the rim 86 provided on the diaphragm structure 77 surrounding the rectangular diaphragm 79 is relatively thin, the base plate 78 provides support for this rim to provide the necessary strength for the pressure sensor 76.

In order to obtain adequate performance characteristics such as sensitivity in the miniaturized pressure sensor assembly 76 hereinbefore described, it has been found desirable to have as much of the width of diaphragm structure 77 as possible be occupied by the diaphragm 79 and at the same time to minimize the portion of the diaphragm structure 77 occupied by the rim. In order to achieve a diaphragm width ratio of at least 0.45 to 0.9 with respect to the width of the diaphragm 79 to the width of the structure 77 and therefore to obtain the largest diaphragm possible in the diaphragm structure 77, diaphragm 79 is made relatively large compared to rim 86. With current manufacturing technology, it has been found feasible to have a width of rim 86 of 40 microns, which provides for a diaphragm 79 of 170 microns in a 250 micron-wide diaphragm structure 77 to provide a diaphragm width ratio of 0.68. In a larger diaphragm structure such as 350 microns wide, the pressure sensor assembly 76 can be made stronger by increasing the rim width to 90 microns. Alternatively, it can be made more sensitive by increasing the diaphragm width up to 270 microns. This results in a diaphragm width ratio for a 350 micron-wide device of between 0.49 and 0.77, depending on what combination of sensitivity and strength is desired.

Prior to or after the formation of the rectangular diaphragm 79, a plurality of V-shaped recesses or grooves 91 are formed in the diaphragm structure 77 on the end opposite the end at which the diaphragm 79 is located and on the side opposite the side in which the well 84 is formed. These V-shaped recesses 91 also can be formed in a conventional manner by the use of a conventional etch. It should be appreciated that if desired, the etching can be stopped so that the recesses 91 formed are short of a complete V. By way of example, if the etching for the V-shaped recess was stopped at a depth of 12 microns, the bottom of the substantially V-shaped recess or trench 91 would be approximately 8 microns wide.

After the V-shaped or substantially V-shaped recesses have been formed, a P+ diffusion utilizing a suitable material such as boron can be carried out to create a V-shaped region 92 (in

the structure 77) which underlies the V-shaped recess 91. Utilizing suitable masking a common layer 93 of a suitable material such as chromium is sputtered into the V-shaped recess 91 to a suitable thickness as for example, 300 Angstroms followed by a layer 94 of a suitable material such as gold of a suitable thickness as for example 3000 Angstroms. The layers 93 and 94 overlie the bottom surface 81 to form pads 96 thereon. In depositing the gold in the V-shaped recess 91 it is desirable to terminate the gold just short of the leftmost extremity of the V-shaped recess as viewed in FIG. 8 in order to minimize the likelihood of lead-to-lead shorting during the dicing operation when a wafer is sawed up into individual sensor chips.

By way of example, the spacing between V-grooves 91 from center to center can be 75 microns with the V-groove having a width of 25 microns and having a typical depth of 18 microns. The metal pads 96 formed by the chromium and gold layers 93 and 94 can have a suitable width as for example, 50 microns with the overlap on each side being approximately 12.5 microns to provide a spacing of approximately 25 microns between adjacent V-shaped pads 96. The bottom of the V-shaped groove can have a total length of approximately 250 microns.

The regions 92 formed from the P+ diffusion have patterns that extend to the right from the three V-shaped recesses 91 as viewed in FIG. 8 for a distance so that they underlie the approximate midpoint of the diaphragm 81 on opposite sides to provide generally U-shaped portions or resistors 92a which are located on the diaphragm in areas of a maximum stress to provide maximum sensitivity to pressure changes. The resistors 92a are provided with opposite ends, one end being connected to one each of the V-grooves and the other end being connected to the center or common V-groove. Contact is made to these P+ diffused regions by the chromium and gold layers 93 and 94 hereinbefore described.

The base plate 78 can be formed of a suitable material such as Pyrex supplied by Corning Glassworks and can have the same width as the diaphragm structure 77 but has a length which is less than the length of the diaphragm structure 77 so that the V-shaped grooves 91 are exposed on the underside of the diaphragm structure 77 as shown in FIG. 6. It also can have a suitable length such as 850 microns. It is provided with a rectangular recess or cavity 101 having substantially the same size as the diaphragm 79. It can be etched into the Pyrex by suitable means such as a conventional etching process utilizing hydrochloric acid. After the etching has been completed to form the rectangular recess 101 it is bonded to the lower surface of the diaphragm structure 77 to form a hermetic seal with respect to the same so that the cavity 101 underlies the diaphragm 79 and is exposed to the bottom surface 81 of the diaphragm 79. The cavity 101 below the diaphragm 79 serves as a reference pressure chamber and can be filled with a suitable fluid. For example, it can be filled with air to half an atmosphere to provide a partial vacuum. Alternatively, the cavity 101 can be filled to one atmosphere or it can be completely evacuated.

A trifilar lead structure 106 is connected to the rectangular diaphragm structure 77. It has insulated copper leads 107 of a suitable diameter as for example 48AWG soldered into place to the V-shaped recesses 91 so that the leads 107 extend outwardly therefrom and lie in a plane parallel to the plane of the diaphragm structure 77. The trifilar lead construction 106 provides insulation around each lead and in addition there is provided additional insulation which surrounds the leads and which interconnects the leads into a single unit which can be readily extended through the hypotube forming the flexible elongate member 41.

US 8,419,648 B2

7

The pressure sensor assembly **76** is mounted within a cut-out **111** provided in the transition housing **51** and secured therein by suitable means such as an epoxy **112** so that the outer surface of the pressure sensor assembly **76** is generally flush with the outer surface of the transition housing **51** (see FIG. **3**) and so that the diaphragm **79** is exposed to ambient and the leads **106** extend through the flexible elongate member **41** to the proximal extremity **42** of the same where they are connected to the sleeves (not shown) carried by the proximal extremity **42** disposed within the housing **68**. Also, the conductors **61** and **62** of the velocity sensing transducer **58** are connected to two of such sleeves (not shown) provided on the proximal extremity **42**.

A schematic of the wiring for the pressure sensor assembly **76** is shown in FIG. **12**. The two generally U-shaped portions **92**a on opposite sides of the diaphragm **79** are represented as resistors and are connected to the three leads **107** in the manner shown. One of the first of the outside leads **107** is "SIGNAL OUT" (+) and the second or other outside lead is "SIGNAL OUT" (−) and the third or middle lead is a common lead as shown. This pattern makes it possible to not cross leads and has the third lead going up the middle or center of the die or the diaphragm structure **77**. It can be seen that the two resistors **92**a connected as shown form a half bridge one of the resistors responds positively to pressure change and the other resistor responds negatively to a pressure change. Thus, as a pressure is supplied to the diaphragm **79**, one resistor increases in value and the other resistor decreases in value to provide a voltage change. By applying the same current to both resistors at the same time, temperature effects can be measured because temperature change will affect both of the resistors in the same way so that the pressure measurements can be compensated for any changes in temperature which are sensed by the resistors **92**a. The changes in resistivity caused by the temperature changes in the resistors will cancel each other out because of the half bridge configuration used. In connection with FIG. **12** it can be seen that with the use of three leads it is possible to obtain temperature compensation by utilizing a half-bridge configuration for the pressure sensor. Alternatively, a more precise temperature compensation can be provided by directly measuring the two resistances, and then solving the mathematical equations which relate temperature and pressure to the two sensor resistances.

Operation and use of the guide wire **21** in performing a catheterization procedure such as angioplasty may now be briefly described as follows: Let it be assumed that a guiding catheter (not shown) has been introduced into the femoral artery of the patient **22** shown in FIG. **1** with the distal extremity near the desired location in the heart in which it is desired to perform an angioplasty. The guide wire **21** of the present invention is inserted into the guiding catheter. At the time that its distal extremity is in close proximity to the distal extremity of the guiding catheter, the pressure output signal from the guide wire is compared with that of the guiding catheter assuming that the guide wire is provided with pressure sensing capabilities. If there is a difference between the two pressure measurements, the pressure measurement from the guide wire **21** is equalized with that from the guiding catheter at the control console **29**. The distal extremity of the guide wire **21** is then advanced so that it is proximal of the stenosis to be treated at which time a pressure measurement is made. After this pressure measurement has been recorded, the distal extremity of the guide wire is then advanced through the stenosis and another pressure measurement made to determine whether the stenosis is severe enough to require treatment by angioplasty. Alternatively, the distal extremity of guide wire **21** can be immediately advanced to the distal side

8

of the stenosis rather than making a pressure measurement proximal of the stenosis and thereafter comparing the pressure measurement on the distal extremity being measured by the guide wire **21** with the pressure measurement being provided proximal of the stenosis by the guiding catheter. If it is determined that the stenosis causes a partial occlusion which is severe enough to warrant use of an angioplasty procedure, an angioplasty catheter having a balloon thereon (not shown) can be advanced over the guide wire **21** and advanced into the stenosis to dilate the stenosis. After dilation has occurred, the angioplasty balloon can be withdrawn from the stenosis and pressure measurements can be made proximal and distal of the stenosis to ascertain the effect of the angioplastic treatment. If the pressure measurements indicate that the original dilation by the angioplasty balloon has been inadequate, another balloon catheter as for example, one having a balloon of a greater diameter can then be positioned over the guide wire **21** by utilizing an exchange wire if appropriate. The larger angioplasty catheter can be advanced through the stenosis and inflated to again dilate the stenosis to a larger size after which it can be withdrawn. Thereafter, pressure measurements proximal and distal of the stenosis can again be made to ascertain whether or not the second dilation which has been performed is adequate. The decisions to be made in connection with such procedures can be readily made by use of the control console **29** by observing the traces **33** and **34** on the video monitor **31**.

It also should be appreciated that at the same time Doppler velocity measurements can be made by the transducer **58**. That information can be used in connection with the pressure measurements to ascertain the need for performing the angioplasty procedure or for determining the efficacy of the angioplasty procedure performed. Because of the very small diameters of the guide wires as for example, 0.018" or 0.014", it is possible to utilize the guide wire **21** of the present invention with very small coronary vessels in the heart. In connection with the leads from the Doppler transducer **58** it should be appreciated that if desired some of the conductors provided for the Doppler ultrasound transducer can be shared with the wires or conductors provided for the pressure sensor assembly **76**. Thus, two of the wires for the pressure sensor can be utilized for the Doppler transducer because the pressure sensor operates at DC or up to a few hundred Hz or KHz whereas the Doppler sensor operates at 10 MHz and above. These frequency ranges can be readily separated by one skilled in the art by using simple filters and the appropriate circuitry.

In connection with the present invention it should be appreciated that rather than bonding the leads **107** into the V-grooves or V-shaped recesses **91**, the Pyrex base plate **78** can be formed so it has the same length as the diaphragm structure **77**. V-shaped or U-shaped grooves can be formed in the base plate underlying the V-shaped grooves to in effect form little tunnels which can be utilized for receiving the wires **107** and for them to be soldered therein. Such a construction aids in the placement of wires which are of the very small diameter, as for example, 1 mil.

Another embodiment of a guide wire **121** incorporating the present invention is shown in FIG. **13**. In the guide wire **121**, pressure sensor assembly **76** is mounted in a tip housing **122**. The tip housing **122** can be substituted at the end cap **57** and threaded into the distal extremity **56** of the coil **54**. The tip housing **122** can be formed of a suitable material such as stainless steel having an outside diameter of 0.018" and a wall thickness of 0.001" to 0.002". The sensor assembly **76** can be of the type hereinbefore described and can be mounted in a cutout **123** provided in the tip housing **122** much in the same manner as the sensor assembly **76** was mounted in the cutout

US 8,419,648 B2

9

111 in the transition housing 51 such as by use of an epoxy 124. An hemispherical end cap 126 formed of a radiopaque material such as palladium or tungsten platinum alloy can be mounted on the distal extremity of the tip housing 122. Alternatively, the end cap 126 can be formed of a non-radiopaque material such as epoxy or silicone rubber.

Thus it can be seen with the embodiment of the guide wire 121 shown in FIG. 13, the guide wire 121 can be utilized in the same manner as the guide wire 21 hereinbefore described with the exception of it cannot be used for making velocity measurements because that capability has been removed from the guide wire 121.

Another guide wire 131 incorporating the present invention is shown in FIG. 14 in which two pressure sensors 76 have been provided. The sensors 76 have been spaced apart a suitable distance as for example, 3 centimeters with one of the pressure sensors being mounted in the transition housing 51 and the other pressure sensor being mounted in a tip housing 122 of the type shown in FIG. 13. With such an arrangement, it can be seen that the distal extremity of the guide wire 131 can be advanced across a stenosis in a vessel with the pressure sensor 76 mounted in the tip housing being distal of the stenosis to measure distal pressure and the pressure sensor 76 in the transition housing 51 being proximal of the stenosis to measure proximal pressure. Thus, it can be seen that it is possible to measure simultaneously the distal pressure and the proximal pressure with respect to a stenosis in a vessel. This may give more accurate measurements than utilizing the proximal pressure being sensed by the guiding catheter.

When using two pressure sensors 76 in the same guide wire as shown in FIG. 14, it is possible to utilize the same common wire for both of the transducers, thus making it necessary to provide only five wires rather than six wires for the two pressure sensors.

Still another guide wire 141 incorporating the present invention is shown in FIG. 15 in which a cover 142 is provided for covering the pressure sensor assembly 76 provided in the transition housing 51. The cover is elongate and extends the length of the cutout 111 and is arcuate in cross-section so that it conforms to the conformation of the transition housing 51. The cover 142 can be secured in place by a suitable means such as an adhesive. The cover 142 overlying the pressure sensor assembly 76 is provided with a pin hole 143 which immediately overlies the diaphragm 79. The pin hole 143 can be of a suitable size as for example 2-5 mils in and preferably 3 mils in diameter. The cover 142 serves to prevent the large opening provided by the cutout 111 from collecting blood which could possibly clot. The cover 142 also serves to protect the sensor 76 from damage. It also prevents the sensor 76 from being broken loose during use of the guide wire 141. It should be appreciated that if desired, the volume beneath the cover 142 can be filled with viscous fluid such as oil which can be utilized for transmitting pressure from the pin hole 143 to the diaphragm 81. With a small size pin hole 143, the viscous fluid provided would not have a tendency to bleed out of the transition housing 51. The viscous fluid would be held in place because of the surface tension of the fluid. Because there is a very short distance between the pin hole 143 and the diaphragm 79, there would be very little tendency for the viscous fluid to damp any pressure signal transmitted from the blood in which the guide wire 141 is disposed to the diaphragm.

Another guide wire 151 incorporating the present invention is shown in FIG. 16 having a transition housing 152 formed of a suitable material such as stainless steel and having an OD of 0.018" or less. A pressure sensor assembly 76 of the type hereinbefore described is mounted within the bore

10

153 of the transition housing 152 and is secured therein by mounting the same in an epoxy 154 while leaving the area immediately above the diaphragm 79 exposed to a pin hole 156 provided in the transition housing 152. The space overlying the diaphragm 81 exposed to the pin hole 156 can be filled with a viscous fluid 157 such as oil. The viscous fluid 157 can be retained within the desired location by a barrier 158 formed on the proximal side of the pressure sensor 76 having the trifilar lead structure 106 extending therethrough, in sealing engagement therewith. To seal the other end of the bore 153, an intermediate end cap 161 can be provided which is provided with a barrier 182 extending thereacross to seal the bore 153. The intermediate end cap 161 can be bonded to the transition housing 152 by a suitable means such as an adhesive (not shown). The coil 54 can be threaded onto the intermediate end cap 161 and can be threaded onto a tip housing 166 that carries a rounded hemispherical tip 167. With such a construction it can be seen that the pressure sensor assembly 76 is protected within the transition housing 152.

In FIG. 16A a guide wire 168 is shown which is very similar to the guide wire 151 with the exception that the housing 152 has been provided on the distal extremity of the coil 46 with the tip 167 directly mounted on the housing 152 for closing the bore 153.

In FIG. 17 there is shown another embodiment of a guide wire 171 incorporating the present invention which has an integral balloon carried thereby. A guide wire with an integral balloon is described in U.S. Pat. No. 5,226,421. The guide wire 171 consists of a flexible elongate tubular member 173 in a manner formed of a suitable material such as plastic which is provided with a distal extremity 174. An inflatable balloon 176 is secured to the distal extremity 174 of the flexible elongate member 173 in a manner well known to those skilled in the art. Such a balloon can be formed integral with the distal extremity and can be formed of the same material as the flexible elongate tubular member 173. Alternatively, it can be formed of a different material or the same material and be formed as a separate part and secured to the distal extremity 174 by suitable means such as adhesive.

The balloon 176 is provided with a distal extremity which is closed and which is secured to the proximal extremity of a coil spring 178 formed of a radiopaque material such as a palladium or tungsten platinum alloy threaded onto a tip housing 179. The tip housing 179 can be formed in a manner similar to the tip housing 122 shown in FIG. 13 having a pressure sensor 76 mounted therein and carrying an end cap 181. The trifilar leads 106 connected to the sensor 76 extend through the coil 118 and through the balloon 176 and through the flexible elongate tubular member 172 to the proximal extremity thereof. A core wire 186 formed of a suitable material such as stainless steel is provided in the flexible elongate member 173 and can be provided with a diameter such as disclosed in U.S. Pat. No. 5,226,421. The core wire 186 is provided with a tapered portion 186a extending through the balloon which has a distal extremity secured to the housing 179 by a suitable means such as the epoxy utilized for mounting the sensor 76 within the housing. The flexible elongate tubular member 172 is provided with a balloon inflation lumen 187 which can be used for inflating and deflating the balloon 176.

The guide wire 171 with an integral balloon 171 can be utilized in a manner similar to that hereinbefore described for the other guide wires. Rather than deploying a separate catheter with a balloon thereon over the guide wire, the guide wire 171 itself carries the balloon 176 which can be inflated to dilate the stenosis after the proximal and distal pressure mea-

US 8,419,648 B2

11 12

surements have been made by the tip mounted sensor **76**. After the balloon **176** has been deflated, the pressure measurement can be made to ascertain the pressure in the distal extremity after dilation has occurred. If necessary, the balloon **176** can be re-inflated to perform another dilation of the stenosis to obtain improved blood flow through the stenosis.

After an appropriate dilation has occurred, the guide wire **171** with integral balloon can be removed in a conventional manner. The angioplasty procedure can then be completed in a conventional manner.

From the foregoing, it can be seen that there has been provided an ultra miniature pressure sensor which can be utilized on guide wires having a diameter of 0.018" and less which can be utilized for making accurate measurements proximal and distal of a stenosis in the coronary vessel. This is made possible because of the small size of the pressure sensor incorporated into the distal extremity of the guide wire. In addition to sensing pressure, flow velocity can also be obtained by the use of a distally mounted velocity transducer provided on the same guide wire as on which the pressure sensor is mounted. Alternatively, additional first and second pressure sensors can be provided on the distal extremity of a guide wire so that pressure measurements can be made simultaneously, proximally and distally of the stenosis. The pressure sensor is constructed in such a manner so that it can be readily incorporated within the confines of a small guide wire as for example, 0.018" and less. It can be constructed to avoid a large opening in the distal extremity of the guide wire to inhibit or prevent the formation of clots. The pressure sensor also can be protected so that it cannot be readily damaged or broken loose. In addition, where desired, the guide wire can be provided with an integrally mounted balloon on its distal extremity so that the guide wire can be utilized for performing an angioplasty procedure while at the same time facilitating the making of pressure measurements, proximal and distal of the stenosis being treated.

The invention claimed is:

**1**. A pressure sensor apparatus, comprising:

a long proximal hypotube having an outside diameter of 0.018" or less,

a flexible floppy tip extending distal of the long proximal hypotube, the flexible floppy tip comprising:

a first flexible element, disposed near a distal portion of the long proximal hypotube, with an outer diameter of 0.018" or less and an increased flexibility relative to the long proximal hypotube;

a short hypotube sensor housing disposed near a distal extremity of the first flexible element, the sensor housing having:

a cylindrical external wall having an outer diameter of 0.018" or less,

a length between 1 mm and 5 mm,

a lumen, and

a cutout in the cylindrical external wall;

a second flexible element, disposed near a distal extremity of the short hypotube sensor housing, with an outer diameter of 0.018" or less and an increased flexibility relative to the long proximal hypotube; and

a solid state pressure sensor mounted within the short hypotube sensor housing, such that:

a pressure sensitive region located at or near one end of the solid state pressure sensor projects into the lumen of the short hypotube sensor housing without contacting the cylindrical external wall of the sensor housing; and

the pressure sensitive region is exposed to ambient by the cutout in the cylindrical external wall of the sensor housing,

wherein the pressure sensitive region includes a diaphragm structure, a base plate, and at least one resistive element responsive to changes in pressure; and

three electrical conductors extending from a proximal portion of the long proximal hypotube to the solid state pressure sensor, the three electrical conductors coupled to the solid state pressure sensor such that the coupled portions of the three electrical conductors and the solid state pressure sensor are positioned within the short hypotube sensor housing.

**2**. The pressure sensor apparatus of claim **1**, wherein the at least one resistive element consists of two resistive element.

**3**. The pressure sensor apparatus of claim **2**, wherein at least one of the two resistive elements is disposed on the solid state pressure sensor in the pressure sensitive region.

**4**. The pressure sensor apparatus of claim **1**, wherein the solid state pressure sensor comprises a semiconductor material.

**5**. The pressure sensor apparatus of claim **1**, wherein at least one resistive element overlies at least a portion of the diaphragm.

**6**. The pressure sensor apparatus of claim **1**, comprising an end cap disposed distally from the second flexible element.

**7**. The pressure sensor apparatus of claim **6**, wherein the end cap is rounded.

**8**. The pressure sensor apparatus of claim **7**, wherein the end cap is hemi-spherical.

**9**. The pressure sensor apparatus of claim **1**, wherein the three electrical conductors comprise a trifilar structure.

**10**. The pressure sensor apparatus of claim **1**, comprising a core wire extending from a proximal extremity of the long proximal hypotube, through the sensor housing, and to a distal extremity of the second flexible element.

**11**. The pressure sensor apparatus of claim **1**, wherein the second flexible element is a coil and comprises a radiopaque material.

**12**. The pressure sensor apparatus of claim **1**, wherein the at least one resistive element comprises a first resistive element that responds positively to a pressure change and a second resistive element that responds negatively to the pressure change and the first and second resistive elements form a half bridge.

**13**. The pressure sensor apparatus of claim **1**, wherein the base plate has a rectangular profile.

**14**. The pressure sensor apparatus of claim **1**, wherein the diaphragm is positioned directly opposite the cutout in the sensor housing within the lumen of the sensor housing.

**15**. The pressure sensor apparatus of claim **1**, wherein the first flexible element comprises a flexible elongate tubular member formed of a plastic material.

**16**. The pressure sensor apparatus of claim **1**, wherein the first flexible element is a hypotube formed of a plastic material.

**17**. The pressure sensor apparatus of claim **1**, wherein the first flexible element is a coil.

**18**. The pressure sensor apparatus of claim **1**, wherein the first flexible element comprises a balloon.

**19**. The pressure sensor apparatus of claim **1**, further comprising a core wire extending along a length of the long proximal hypotube and within the first flexible element.

**20**. The pressure sensor apparatus of claim **19**, wherein the core wire tapers within the first flexible element.

US 8,419,648 B2

**13**

**21**. The pressure sensor apparatus of claim **20**, wherein the core wire tapers from a larger diameter to a smaller diameter as the core wire extends distally within the first flexible element.

**22**. The pressure sensor apparatus of claim **21**, wherein the first flexible element comprises a plastic material.

**23**. The pressure sensor apparatus of claim **19**, wherein the first flexible element has a length of approximately 27 cm.

**24**. The pressure sensor apparatus of claim **23**, wherein the second flexible element is a coil and has a length of approximately 3 cm.

**25**. The pressure sensor apparatus of claim **1**, wherein the first flexible element comprises a plastic material.

**26**. The pressure sensor apparatus of claim **1**, wherein the solid state pressure sensor is secured to the sensor housing by an adhesive.

**27**. The pressure sensor apparatus of claim **1**, wherein one of the three electrical conductors provides a common lead to the solid state pressure sensor.

**28**. The pressure sensor apparatus of claim **27**, wherein two of the three electrical conductors are return leads from the solid state pressure sensor.

**29**. The pressure sensor apparatus of claim **28**, wherein the common conductor is coupled to a pair of resistive elements and the return conductors are each coupled to a single one of the pair of resistive elements.

**30**. A pressure sensor apparatus, comprising:

a long proximal hypotube having an outside diameter of 0.018″ or less;

a flexible floppy tip extending distal of the long proximal hypotube, the flexible floppy tip comprising:

a short hypotube sensor housing disposed distal of a distal extremity of the long proximal hypotube, the short hypotube sensor housing having;

an outer diameter of 0.018″ or less;

a length between 1 mm and 5 mm, and

a cutout in a wall thereof;

a first flexible element, disposed between the long proximal hypotube and the short hypotube sensor housing, with an outer diameter of 0.018″ or less and an increased flexibility relative to the long proximal hypotube;

a second flexible element, disposed distal of the short hypotube sensor housing, with an outer diameter of 0.018″ or less and an increased flexibility relative to the long proximal hypotube;

a solid state pressure sensor comprising a pressure sensitive region located at or near one end thereof with a diaphragm and at least one resistive element responsive to pressure;

wherein the solid state pressure sensor is disposed within the short hypotube sensor housing such that:

the pressure sensitive region is spaced from an external wall of the short hypotube sensor housing; and

the diaphragm is exposed to ambient by the cutout in the short hypotube sensing housing; and

three electrical conductors extending from a proximal extremity of the long proximal hypotube to the solid state pressure sensor, a distal portion of the electrical conductors coupled to the solid state pressure sensor within the short hypotube sensor housing.

**31**. The pressure sensor apparatus of claim **30**, wherein the second flexible element is a coil and comprises a radiopaque material.

**32**. The pressure sensor apparatus of claim **30**, wherein the long proximal hypotube has an outside diameter of approximately 0.014″ or less.

**14**

**33**. The pressure sensor apparatus of claim **30**, wherein the outer diameter of the sensor housing is equal to the outer diameter of the long proximal hypotube.

**34**. The pressure sensor apparatus of claim **30**, further comprising a core wire extending along a length of the long proximal hypotube.

**35**. The pressure sensor apparatus of claim **30**, wherein the first flexible element comprises a flexible elongate tubular member formed of a plastic material.

**36**. The pressure sensor apparatus of claim **30**, wherein the first flexible element is a hypotube formed of a plastic material.

**37**. The pressure sensor apparatus of claim **30**, wherein the first flexible element is a coil.

**38**. The pressure sensor apparatus of claim **30**, wherein the first flexible element comprises a balloon.

**39**. The pressure sensor apparatus of claim **30**, further comprising a core wire extending along a length of the guidewire and within the first flexible element.

**40**. The pressure sensor apparatus of claim **39**, wherein the core wire tapers within the first flexible element.

**41**. The pressure sensor apparatus of claim **40**, wherein the core wire tapers from a larger diameter to a smaller diameter as the core wire extends distally within the first flexible element.

**42**. The pressure sensor apparatus of claim **39**, wherein the first flexible element has a length of approximately 27 cm.

**43**. The pressure sensor apparatus of claim **42**, wherein the second flexible element is a coil and has a length of approximately 3 cm.

**44**. The pressure sensor apparatus of claim **43**, wherein the sensor housing has a length between 1 mm and 5 mm.

**45**. The pressure sensor apparatus of claim **30**, wherein the first flexible element comprises a plastic material.

**46**. The pressure sensor apparatus of claim **30**, further comprising an end cap disposed distally from the second flexible element.

**47**. The pressure sensor apparatus of claim **46**, wherein the end cap is rounded.

**48**. The pressure sensor apparatus of claim **47**, wherein the end cap is hemi-spherical.

**49**. The pressure sensor apparatus of claim **30**, wherein the solid state pressure sensor is secured to the sensor housing by an adhesive.

**50**. The pressure sensor apparatus of claim **30**, wherein one of the three conductors provides a common conductor to the solid state pressure sensor.

**51**. The pressure sensor apparatus of claim **50**, wherein two of the three conductors are return conductors from the solid state pressure sensor.

**52**. The pressure sensor apparatus of claim **51**, wherein the common conductor is coupled to a pair of resistive elements and the return conductors are each coupled to a single one of the pair of resistive elements.

**53**. A pressure sensor apparatus comprising:

a long proximal hypotube having an outside diameter of 0.018″ or less,

a first flexible element, disposed distal of the long proximal hypotube, with an outer diameter of 0.018″ or less and an increased flexibility relative to the long proximal hypotube,

a short hypotube sensor housing disposed distal of a distal extremity of the first flexible element, and having a cylindrical wall with an outer diameter of 0.018″ or less, a length between 1 mm and 5 mm, and a cutout in the cylindrical wall;

US 8,419,648 B2

<table>
<tr><td>15</td><td>16</td></tr>
</table>

a second flexible element, disposed distally from the short hypotube sensor housing, with an outer diameter of 0.018" or less and an increased flexibility relative to the long proximal hypotube,

a solid state pressure sensor mounted within the short hypotube sensor housing such that a pressure sensitive region of the solid state pressure sensor is exposed to ambient via the cutout, the solid state pressure sensor comprising at least one resistive element responsive to pressure, and

electrical conductors extending from a proximal extremity of the long proximal hypotube to the solid state pressure sensor, wherein the electrical conductors are coupled to the solid state pressure sensor within the short hypotube sensor housing and wherein the electrical conductors are coupled to conducting sleeves at the proximal extremity of the long proximal hypotube.

**54**. The pressure sensor apparatus of claim **53**, wherein the electrical conductors comprise three conductors.

**55**. The pressure sensor apparatus of claim **53**, wherein the second flexible element is a coil and comprises a radiopaque material.

**56**. The pressure sensor apparatus of claim **53**, wherein the at least one resistive element comprises a first resistive element that responds positively to a pressure change and a second resistive element that responds negatively to the pressure change and the first and second resistive elements form a half bridge.

**57**. The pressure sensor apparatus of claim **56**, wherein at least one of the plurality of resistive elements is disposed on the solid state pressure sensor in the pressure sensitive region.

**58**. The pressure sensor apparatus of claim **53**, wherein the first flexible element comprises a flexible elongate tubular member formed of a plastic material.

**59**. The pressure sensor apparatus of claim **53**, wherein the first flexible element is a hypotube formed of a plastic material.

**60**. The pressure sensor apparatus of claim **53**, wherein the first flexible element is a coil.

**61**. The pressure sensor apparatus of claim **53**, wherein the first flexible element is a balloon.

**62**. The pressure sensor apparatus of claim **53**, further comprising a core wire extending along a length of the long proximal hypotube and within the first flexible element.

**63**. The pressure sensor apparatus of claim **53**, wherein the core wire tapers within the first flexible element.

**64**. The pressure sensor apparatus of claim **63**, wherein the core wire tapers from a larger diameter to a smaller diameter as the core wire extends distally within the first flexible element.

**65**. The pressure sensor apparatus of claim **53**, wherein the first flexible element has a length of approximately 27 cm.

**66**. The pressure sensor apparatus of claim **65**, wherein the second flexible element is a coil and has a length of approximately 3 cm.

**67**. The pressure sensor apparatus of claim **66**, wherein the sensor housing has a length between 1 mm and 5 mm.

**68**. The pressure sensor apparatus of claim **53**, wherein the flexible element comprises a plastic material.

**69**. The pressure sensor apparatus of claim **53**, further comprising an end cap disposed distally from the the second flexible element.

**70**. The pressure sensor apparatus of claim **69**, wherein the end cap is rounded.

**71**. The pressure sensor apparatus of claim **70**, wherein the end cap is hemi-spherical.

**72**. The pressure sensor apparatus of claim **53**, wherein at least a portion of the solid state pressure sensor is secured to the sensor housing by an adhesive.

**73**. The pressure sensor apparatus of claim **53**, wherein one of three electrical conductors provides a common lead to the solid state pressure sensor.

**74**. The pressure sensor apparatus of claim **73**, wherein two of the three electrical conductors are return leads from the solid state pressure sensor.

**75**. The pressure sensor apparatus of claim **74**, wherein the common lead is coupled to a pair of resistive elements and the return leads are each coupled to a single one of the pair of resistive elements.

\*    \*    \*    \*    \*



US008419647B2

(12) **United States Patent**       (10) **Patent No.:**       **US 8,419,647 B2**

Corl et al.                          (45) **Date of Patent:**       *Apr. 16, 2013

(54) **ULTRA MINIATURE PRESSURE SENSOR**

(75) Inventors: **Paul D. Corl**, Alto, CA (US); **Robert Z. Obara**, Sunnyvale, CA (US); **John E. Ortiz**, East Palo Alto, CA (US)

(73) Assignee: **Volcano Corporation**, Rancho Cordova, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/169,174**

(22) Filed: **Jun. 27, 2011**

(65) **Prior Publication Data**

US 2011/0251497 A1    Oct. 13, 2011

**Related U.S. Application Data**

(63) Continuation of application No. 11/650,064, filed on Jan. 4, 2007, now Pat. No. 7,967,762, which is a continuation of application No. 11/303,249, filed on Dec. 15, 2005, which is a continuation of application No. 10/247,043, filed on Sep. 19, 2002, now Pat. No. 6, 976,965, which is a continuation of application No. 09/644,111, filed on Aug. 21, 2000, now Pat. No. 6, 767,327, which is a continuation of application No. 08/912,879, filed on Aug. 15, 1997, now Pat. No. 6, 106,476, which is a continuation-in-part of application No. 08/710,062, filed on Sep. 9, 1996, which is a continuation of application No. 08/300,445, filed on Sep. 2, 1994, now abandoned.

(51) **Int. Cl.**
*A61B 5/02*         (2006.01)

(52) **U.S. Cl.**
USPC ............................ **600/485**; 600/486; 600/561

(58) **Field of Classification Search** ............ 600/481–528
See application file for complete search history.

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,490,441 | A | 1/1970 | Curtis |
| 3,545,275 | A | 12/1970 | Harrison |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 2246687 | 3/1974 |
| DE | 2708607 | 2/1977 |

(Continued)

OTHER PUBLICATIONS

Ko, et al., "Development of a Miniature Pressure Transducer for Biomedical Applications" (IEEE Transactions on Electron Devices, vol. ED-26, 1979).

(Continued)

*Primary Examiner* — Michael Kahelin
*Assistant Examiner* — Karen Toth
(74) *Attorney, Agent, or Firm* — Haynes and Boone, LLP

(57)                    **ABSTRACT**

A method of measuring blood pressure and velocity proximally and distally of a stenosis in a vessel carrying blood includes the steps of providing a guide wire having both a pressure sensor and a velocity sensor disposed on a distal region of the guide wire, introducing the guide wire into the vessel, advancing the guide wire to position the pressure sensor and the velocity sensor proximally and distally of the stenosis, and measuring the blood pressure and velocity proximally and distally of the stenosis with the pressure sensor and the velocity sensor.

**54 Claims, 6 Drawing Sheets**



**US 8,419,647 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,724,274 | A | 4/1973 | Millar |
| 3,748,623 | A | 7/1973 | Millar |
| 4,020,830 | A | 5/1977 | Johnson et al. |
| 4,274,423 | A | 6/1981 | Mizuno et al. |
| 4,554,927 | A | 11/1985 | Fussell |
| 4,610,256 | A | 9/1986 | Wallace |
| 4,659,235 | A | 4/1987 | Gilmore et al. |
| 4,722,348 | A | 2/1988 | Ligtenberg et al. |
| 4,733,669 | A | 3/1988 | Segal |
| 4,748,986 | A | 6/1988 | Morrison et al. |
| 4,771,782 | A | 9/1988 | Millar |
| 4,807,477 | A | 2/1989 | Myers et al. |
| 4,808,164 | A | 2/1989 | Hess |
| 4,815,472 | A | 3/1989 | Wise et al. |
| 4,872,483 | A | 10/1989 | Shah |
| 4,881,410 | A | 11/1989 | Wise et al. |
| 4,901,731 | A | 2/1990 | Millar |
| 4,901,735 | A | 2/1990 | von Berg |
| 4,908,693 | A | 3/1990 | Nishiguchi |
| 4,928,693 | A | 5/1990 | Goodin et al. |
| 4,945,762 | A | 8/1990 | Adamic, Jr. |
| 4,953,553 | A | 9/1990 | Tremulis |
| 4,964,409 | A | 10/1990 | Tremulis |
| 5,013,396 | A | 5/1991 | Wise et al. |
| 5,046,497 | A | 9/1991 | Millar |
| 5,050,297 | A | 9/1991 | Metzger |
| 5,050,606 | A | * | 9/1991 | Tremulis .................. 600/486 |
| 5,067,491 | A | 11/1991 | Taylor et al. |
| 5,085,223 | A | 2/1992 | Lars et al. |
| 5,113,868 | A | * | 5/1992 | Wise et al. .................. 600/488 |
| 5,125,137 | A | 6/1992 | Corl et al. |
| 5,163,445 | A | 11/1992 | Christian et al. |
| 5,174,295 | A | 12/1992 | Christian et al. |
| 5,178,153 | A | 1/1993 | Einzig |
| 5,178,159 | A | 1/1993 | Christian |
| 5,207,102 | A | 5/1993 | Takahashi et al. |
| 5,207,103 | A | 5/1993 | Wise et al. |
| 5,226,421 | A | 7/1993 | Frisbie et al. |
| 5,226,423 | A | 7/1993 | Tenerz et al. |
| 5,240,437 | A | 8/1993 | Christian |
| 5,313,957 | A | 5/1994 | Little |
| 5,348,481 | A | 9/1994 | Ortiz |
| 5,358,409 | A | 10/1994 | Obara |
| 5,412,994 | A | 5/1995 | Cook et al. |
| 5,450,091 | A | 9/1995 | Ilama |
| 5,450,853 | A | * | 9/1995 | Hastings et al. ......... 600/488 |
| 5,517,989 | A | * | 5/1996 | Frisbie et al. ........... 600/585 |
| 5,551,301 | A | 9/1996 | Cowan |
| 5,668,320 | A | 9/1997 | Cowan |
| 5,715,827 | A | * | 2/1998 | Corl et al. ............... 600/486 |
| 5,807,477 | A | 9/1998 | Heart et al. |
| 5,902,248 | A | * | 5/1999 | Millar et al. ............ 600/485 |
| 6,106,476 | A | * | 8/2000 | Corl et al. ............... 600/486 |
| 6,112,598 | A | 9/2000 | Tenerz et al. |
| 6,142,958 | A | 11/2000 | Hammarstrom et al. |
| 6,167,763 | B1 | 1/2001 | Tenerz et al. |
| 6,976,965 | B2 | * | 12/2005 | Corl et al. ............... 600/486 |
| 7,033,321 | B1 | * | 4/2006 | Sullivan ................. 600/585 |
| 7,097,620 | B2 | 8/2006 | Corl et al. |
| 2006/0074318 | A1 | 4/2006 | Ahmed et al. |

## FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0006577 | A | 6/1979 |
| EP | 0036171 | A | 3/1981 |
| EP | 0115548 | | 8/1984 |
| EP | 0215528 | | 9/1986 |
| EP | 0224997 | | 9/1986 |
| EP | 0313836 | | 5/1989 |
| EP | 0387453 | | 12/1989 |
| WO | WO8103613 | A | 12/1981 |
| WO | WO 88/00810 | | 2/1988 |
| WO | WO 90/06722 | | 6/1990 |
| WO | WO 90/07906 | | 7/1990 |
| WO | WO 97/00641 | | 1/1997 |

## OTHER PUBLICATIONS

Chau, Hin-Leung, "An Ultraminiature Solid-State Pressure Sensor for a Cardiovascular Catheter", Transducers 1987.

Chau, Hin-Leung, "An Ultraminiature Solid-State Pressure Sensor for a Cardiovascular Catheter", Abstract of Electron Devices, IEEE Transactions, vol. 35, Issue 12, Dec. 1988.

Non-Final OA issued in U.S. Appl. No. 11/650,064, mailed Jun. 4, 2010, 9 pages.

Non-Final OA issued in U.S. Appl. No. 10/247,043; mailed Jun. 17, 2004; 11 pages.

Non-Final OA issued in U.S. Appl. No. 11/303,249; mailed Jul. 17, 2012; 14 pages.

Final OA issued in U.S. Appl. No. 11/303,249; mailed Nov. 20, 2009; 7 pages.

Non-Final OA issued in U.S. Appl. No. 11/303,249; mailed Mar. 17, 2009; 8 pages.

Non-Final OA issued in U.S. Appl. No. 11/303,249; mailed Mar. 10, 2009; 4 pages.

Non-Final OA issued in U.S. Appl. No. 11/303,249; mailed Dec. 27, 2007; 8 pages.

Non-Final OA issued in U.S. Appl. No. 11/303,249; mailed May 31, 2007; 6 pages.

Final OA issued in U.S. Appl. No. 11/303,249; mailed Apr. 4, 2007; 8 pages.

Non-Final OA issued in U.S. Appl. No. 11/303,249; mailed Aug. 1, 2006; 6 pages.

Final OA issued in U.S. Appl. No. 10/247,043; mailed Mar. 23, 2005; 9 pages.

Final OA issued in U.S. Appl. No. 10/247,043; mailed Jul. 1, 2005; 9 pages.

Non-Final OA issued in abandoned U.S. Appl. No. 11/442,684; mailed Oct. 3, 2007, 6 pages.

M. Esashi et al., "Fabrication of Catheter-Tip and Sidewall Miniature Pressure Sensor," IEEE Transactions on Electron Devices, Vo. ED-29, No. 1, Jan. 1982, pp. 57-63.

European Search Report, EPO, for EP Application No. 83100989.9, Publication No. 0115548, Search completed Aug. 29, 1983.

European Supplementary Search Report, EPO, for EP Application No. 95928311, Publication No. 0778746, Search completed Sep. 3, 1997.

European Search Report, EPO, for EP Application No. 06075026, Publication No. 1658808, Search completed Mar. 17, 2006.

Ji,, Jin, et al., "An Ultraminiature CMOS Pressure Sensor for a Multiplexed Cardiovascular Catheter," IEEE Transactions, vol. 39, No. 10, Oct. 1992.

Wallis, George, et al., "Field Assisted GlassMetal Sealing, AIP Journal of Applied Physics," Citation: J. Appl. Phys. 40, 3946 (1969); doi: 10.1063/1/1657121.

Terry, Stephen C. et al., "A Gas Chromatographic Air Analyzer Fabricated on a Silicon Wafer," IEEE Transactions, Jul. 30, 1979.

Roylance, Lynn Michelle, et al., "A Batch-Fabricated Silicon Accelerometer," IEEE Transactions, vol. ED-26, No. 12, Dec. 1979.

Peterson, Kurt E. , "Silicon as a Mechanical Material," Proceedings of the IEEE, vol. 70, No. 5, May 1982.

Sander, Craig S., et al., "A Monolithic Capacitive Pressure Sensor With Pulse-Period Output," IEEE Transactions, vol. ED-27, No. 5, May 1980.

Tufte, O.N., et al., "Silicon Diffused-Element Piezoresistive Diaphragms," Journal of Applied Physics, vol. 33, No. 11, Nov. 1962.

Tufte, O.N., et al., "Piezoresistive Properties of Silicon Diffused Layers," Citation: J. Appl. Phys. 24, 313 (1963); doi: 10/1063/1. 1702605.

Kanda, Yozo, "A Graphical Representation of the Piezoresistance Coefficients in Silicon," IEEE Transactions, vol. ED-29, No. 1, Jan. 1982.

Guckel, H. et al., "Laser-Recrystallized Piezoresistive Micro-Diaphragm Sensor," IEEE Transactions, 1985.

Sridhar, Uppili, et al., "Temperature Coefficient of Resistance of Piezoresistors," IEEE Transactions, 1992.

Chau, K.H.-L., et al., "High-Stress and Overrange Behavior of Sealed-Cavity Polysilicon Pressure Sensors," IEEE Transactions, 1990.

Sugiyama, Susumu, et al., "Surface Micromachined Micro-Diaphragm Pressure Sensors," IEEE Transactions, 1991.

US 8,419,647 B2
Page 3

Samaun, et al., "An IC Piezoresistive Pressure Sensor for Biomedical Instrumentation," May 1972.

Clark, Samuel K., et al., "Pressure Sensitivity in Anisotropically Etched Thin-Diaphragm Pressure Sensors," IEEE Transactions, vol. ED-26, No. 12, Dec. 1979.

Timoshenko, S., et al., "Theory of Plates and Shells," McGraw-Hill Book Company, 1959.

Lee, Ki-Won, et al., "SENSIM: A Simulation Program for Solid-State Pressure Sensors," IEEE Transactions, vol. ED-29, No. 1, Jan. 1982.

Maseeh, Fariborz, et al., "A CAD Architecture for Microelectromechanical Systems," IEEE Transactions, 1990.

Senturia, Stephen D., et al., "A Computer-Aided Design System for Microelectromechanical Systems (MEMCAD)," IEEE, Journal of Microelectromechanical Systems, vol. 1, No. 1, Mar. 1992.

Zhang, Y., et al., Pressure Sensor Design and Simulation Using the Caemens-D Module, Center for Integrated Sensors and Circuits, University of Michical, IEEE Transactions, 1990.

Huang, J.C.-M., et al., A Monolithic Pressure-pH Sensor for Esophageal Studies, Department of Electrical and Computer Engineering, University of Michigan, IEEE Transactions, 1982.

Lee, Yong S., et al., "A Batch-Fabricated Silicon Capacitive Pressure Transducer with Low Temperature Sensitivity," IEEE Transactions, vol. ED-29, No. 1, Jan. 1982.

Chau, Hin-Leung, "Scaling Limits in Batch-Fabricated Silicon Pressure Sensors," IEEE Transactions, vol. ED-34, No. 4, Apr. 1987.

* cited by examiner













US 8,419,647 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# ULTRA MINIATURE PRESSURE SENSOR

## CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of U.S. application Ser. No. 11/650,064, filed Jan. 4, 2007, now U.S. Pat. No. 7,967,762, which is a continuation of U.S. application Ser. No. 11/303,249, filed Dec. 15, 2005, which is a continuation of U.S. application Ser. No. 10/247,043, filed Sep. 19, 2002, now U.S. Pat. No. 6,976,965, which is a continuation of U.S. application Ser. No. 09/644,111, filed Aug. 21, 2000, now U.S. Pat. No. 6,767,327, which is a continuation of U.S. application Ser. No. 08/912,879, filed Aug. 15, 1997, now U.S. Pat. No. 6,106,476, which is a continuation-in-part of U.S. application Ser. No. 08/710,062, filed Sep. 9, 1996, now U.S. Pat. No. 5,715,827, which is a continuation of U.S. application Ser. No. 08/300,445, filed Sep. 2, 1994, now abandoned, all of which are hereby expressly incorporated by reference in their entirety.

## FIELD OF INVENTION

This invention relates to an ultra miniature pressure sensor and guide wire and apparatus using the same and method, which is particularly suitable for making pressure measurements in coronary arteries of human beings.

It has been well known that it is desirable to make pressure measurements in vessels and particularly in coronary arteries with the advent of angioplasty. Typically in the past, such pressure measurements have been made by measuring the pressure at a proximal extremity of a lumen provided in a catheter advanced into the coronary artery of interest. However, such an approach has been less efficacious as the diameters of the catheters became smaller with the need to advance the catheter into smaller vessels. This made necessary the use of smaller lumens which gave less accurate pressure measurements and in the smallest catheters necessitated the elimination of such a pressure lumen entirely. In an attempt to overcome these difficulties, ultra miniature pressure sensors have been proposed for use on the distal extremities of catheters. However, it has not been feasible prior to the present invention to provide such ultra miniature pressure sensors which are capable of being incorporated in a guide wire for making pressure measurements in a very small arterial vessels. There is therefore a need for a new and improved ultra miniature pressure sensor and a guide wire and apparatus utilizing the same.

In general it is an object of the present invention to provide an ultra miniature pressure sensor and guide wire and apparatus utilizing the same making possible pressure and velocity measurements.

Another object of the invention is to provide a sensor which can be utilized on the distal extremity of a guide wire 0.018" or 0.014" in diameter.

Another object of the invention is to provide a sensor of the above character which is formed of a silicon chip of a small dimension which is reinforced by an additional member to provide reinforcement for the chip.

Another object of the invention is to provide a sensor of the above character in which a thin diaphragm is formed in the crystalline silicon chip.

Another object of the invention is to provide a sensor of the above character in which the reinforcing member extends for approximately 200 microns beyond the silicon diaphragm.

Another object of the invention is to provide a guide wire with the above character in which the number of conducting wires required is kept to a minimum.

Another object of the invention is to provide a guide wire and method in which simultaneous pressure and velocity measurements can be made.

Another object of the invention is to provide a guide wire of the above character in which the diaphragm area has been maximized.

Another object of the invention is to provide a guide wire with the above character in which two pressure sensors are provided on the guide wire which are spaced apart so that pressure measurements can be made on both sides of a stenosis.

Another object of the invention is to provide a guide wire of the above character in which the sensors are covered to prevent the formation of blood clots.

Another object of the invention is to provide an apparatus of the above character which includes a guide wire with an integral inflatable balloon.

Another object of the invention is to provide an apparatus of the above character in which temperature compensation can be provided.

Another object of the invention is to provide an apparatus of the above character which can be utilized in a half-bridge configuration.

Additional features and objects of the invention will appear from the following description in which the preferred embodiments are set forth in detail in conjunction with the accompanying drawings.

## BRIEF DESCRIPTION OF DRAWINGS

FIG. 1 is a schematic illustration showing use of a guide wire incorporating a pressure sensor of the present invention and apparatus utilizing the same in conjunction with a patient undergoing a catheterization procedure for diagnosis or treatment.

FIG. 2 is a side elevational view of a guide wire incorporating an ultra miniature pressure sensor of the present invention.

FIG. 3 is an enlarged side elevational view of the distal extremity of the guide wire shown in FIG. 2 and showing the pressure sensor mounted therein.

FIG. 4 is a top plan view looking along the line 4-4 of FIG. 3.

FIG. 5 is a bottom plan view looking along the line 5-5 of FIG. 3.

FIG. 6 is an isometric view of the pressure sensor shown in FIGS. 3, 4 and 5 with the lead wires connected thereto.

FIG. 7 is a side elevational view of the pressure sensor shown in FIG. 6.

FIG. 8 is a top plan view of the pressure sensor shown in FIGS. 6 and 7.

FIG. 9 is a cross-sectional view taken along the line 9-9 of FIG. 8.

FIG. 10 is a cross-sectional view taken along the line 10-10 of FIG. 8.

FIG. 11 is a cross-sectional view taken along the line 11-11 of FIG. 8.

FIG. 12, is a schematic diagram of the circuitry utilized in the pressure sensor shown in FIGS. 6-11.

FIG. 13 is a side elevational view of the distal extremity of another guide wire incorporating the pressure sensor with the sensor of the present invention being mounted in the tip housing.

US 8,419,647 B2

3

FIG. **14** is a side elevational view of the distal extremity of a guide wire having first and second pressure sensors mounted in the distal extremity of the same spaced apart to permit simultaneous measurements of proximal and distal pressures with respect to a stenosis.

FIG. **15** is a partial side elevational view of another guide wire incorporating the present invention with an enclosed pressure sensor.

FIG. **16** is a side elevational view partially in section of the distal extremity of another guide wire incorporating the present invention in which the pressure sensor is enclosed in a transition housing.

FIG. **16**A is a side elevational view in section showing an end-mounted pressure sensor incorporating the present invention.

FIG. **17** is a side elevational view in section of a guide wire housing a tip-mounted sensor incorporating the present invention with an integral balloon.

DETAILED DESCRIPTION OF THE INVENTION

In general, the guide wire of the present invention having pressure sensing capabilities is comprised of a flexible elongate element having proximal and distal extremities and having a diameter of 0.018" and less. The pressure sensor is mounted on the distal extremity of a flexible elongate element. It is comprised of a crystal semiconductor material having a recess therein and forming a diaphragm bordered by a rim. A reinforcing member is bonded to the crystal and reinforces the rim of the crystal and has a cavity therein underlying the diaphragm and exposed to the diaphragm. A resistor having opposite ends is carried by the crystal and has a portion thereof overlying a portion of the diaphragm. Leads are connected to opposite ends of the resistor and extend within the flexible elongate member to the proximal extremity of the flexible elongate member.

More in particular, the guide wire **21** of the present invention having pressure measuring capabilities as shown in FIG. **1** is one that is adapted to be used in connection with a patient **22** lying on a table or a bed **23** in a cath lab of a typical hospital in which a catheterization procedure such as for diagnosis or treatment is being performed on the patient. The guide wire **21** is used with apparatus **24** which consists of a cable **26** which connects the guide wire **21** to an interface box **27**. Interface box **27** is connected by another cable **28** to a control console **29** which has incorporated as a part thereof a video screen **31** on which a waveform **32** displaying ECG measurements may be provided as well as two traces **33** and **34** displaying pressure measurements being made by the guide wire **21**.

The guide wire **21** is shown more in detail in FIG. **2** and as shown therein, the guide wire **21** can be constructed utilizing the various constructions as shown in U.S. Pat. Nos. 5,125, 137; 5,163,445; 5,174,295; 5,178,159; 5,226,421; and 5,240, 437. As disclosed therein, such a guide wire consists of a flexible elongate element **41** having a proximal and distal extremities **42** and **43** and which can be formed of a suitable material such as stainless steel having an outside diameter for example of 0.018" or less and having a suitable wall thickness as for example, 0.001" to 0.002" and conventionally called a "hypotube" having a length of 150-170 centimeters. Where a smaller guide wire is desired, the hypotube **41** can have an exterior diameter of 0.014" or less. Typically such a guide wire includes a core wire (not shown) of the type disclosed in the above identified patents which extends from the proximal extremity to the distal extremity of the flexible elongate element **41** to provide the desired torsional properties for guide

4

wires (See U.S. Pat. No. 5,163,445, col. 18:40-51) to facilitate steering of the guide wire **21** in the vessel.

A coil spring **46** is provided and is formed of a suitable material such as stainless steel. It has an outside diameter of 0.018" and is formed from a wire having a diameter of 0.003". The spring **46** is provided with a proximal extremity **47** which is threaded onto the distal extremity **43** of the flexible elongate member **41**. The distal extremity **48** of the coil spring **46** is threaded onto the proximal extremity **49** of an intermediate or transition housing **51** as disclosed in U.S. Pat. No. 5,174,295, formed of a suitable material such as stainless steel having an outside diameter of 0.018" and having a suitable wall thickness as for example, 0.001" to 0.002". The housing **51** is provided with a distal extremity **52** which has the proximal extremity **53** of a coil spring **54** threaded thereon. The coil spring **54** is formed of a highly radiopaque material such as palladium or a tungsten platinum alloy. The coil spring **46** can have a suitable length as for example 27 centimeters whereas, the coil spring **54** can have a suitable length such as 3 centimeters. The intermediate or transition housing **51** can have a suitable length as for example, one to five millimeters. The use of the two coils **46** and **54** on opposite ends of the housing **61** provides a very flexible floppy tip for the guide wire **21** as described in U.S. Pat. No. 5,174,295. The coil **54** is provided with a distal extremity which is threaded onto an end cap **57** also formed of a suitable material such as stainless steel and having an outside diameter of 0.018" and a wall thickness of 0.001" to 0.002". An ultrasonic transducer **58** is mounted in the end cap in a manner described in U.S. Pat. No. 5,125,137 and has conductors **61** and **62** secured to the front and rear sides of the same which extend interiorly to the proximal extremity of the flexible elongate member **41**.

A torquer **66** of the type described in U.S. Pat. No. 5,178, 159 is mounted on the proximal extremity **42** of the flexible elongate member **41** for causing a rotation of a guide wire **21** when used in connection with catheterization procedures in a manner well known to those skilled in the art.

The proximal extremity **42** is also provided with a plurality of conducting sleeves (not shown) of the type disclosed in U.S. Pat. No. 5,178,159. In the present invention, one or more additional sleeves can be provided to make connection to the conductors hereinafter described. The proximal extremity **42** of the flexible elongate member is removably disposed within a housing **68** of the type described in U.S. Pat. Nos. 5,178, 159; 5,348,481 and 5,358,409 that makes electrical contact with the sleeves on the proximal extremity **42** while permitting rotation of the sleeves and the flexible elongate member **41**. The housing **68** carries female receptacles (not shown) which receive the sleeves and which are connected to a cable **71** connected to a connector **72**. The connector **72** is connected to another mating connector **73** carried by the cable **26** and connected into the interface box **27**.

The portion of the guide wire **21** therefore described is substantially conventional. In accordance with the present invention it is provided with a pressure measuring capability in the form of a pressure sensor assembly **76** which is mounted within the intermediate or transition housing **51**. The pressure sensor assembly **76** consists of a diaphragm structure **77** supported by a base plate **78**. The diaphragm structure **77** is formed of suitable materials such as "n" type or "p" type **100** oriented silicon with a resistivity of approximately 6-8 ohm-centimeters. The diaphragm structure **77** is a die made from such a wafer. In accordance with the present invention, the die has a suitable length, as for example, 1050 microns and for a 0.014" guide wire has a width of 250 microns and for a 0.018" guide wire has a width of between

US 8,419,647 B2

| 5 | 6 |

250 and 350 microns. It can have a suitable thickness, as for example, 50 microns. A rectangular diaphragm 79 is formed in the diaphragm structure 77 of a suitable thickness, as for example, 2.5 microns and having dimensions such as a length of 350 microns. The diaphragm 79 has first and second or top and bottom surfaces 80 and 81. The diaphragm is formed by utilization of conventional masking and crystal etching techniques which create a die with two parallel sloping endwalls 82 and two parallel sidewalls 83 extending at right angles to the end walls 82 leading down to the top surface 80 of the diaphragm 79 to form a well 84. As hereinafter explained, the diaphragm 79 is made relatively wide in comparison to the diaphragm structure 77 so that what remains is a relatively narrow rim 86 formed by side portions 87 and 88 and an end portion 89. As can be seen from FIGS. 6, 7 and 8, the diaphragm 79 is located at or near one end of the diaphragm structure or die 77. It has been found that it is desirable to provide a rectangular geometry for the diaphragm 79 rather than a square geometry in order to obtain the highest possible sensitivity for pressure measurements. For example, it has been found that the rectangular diaphragm provides approximately 1.5 times more sensitivity than does a square diaphragm for the same diaphragm thickness and width.

In etching the well 84 to form the diaphragm 81, an impurity can be implanted into the backside of the diaphragm structure 77 before the etching process is commenced so that etching will stop at the desired depth, as for example, within 2 to 3 microns of the bottom surface 81 to provide a diaphragm 79 having a thickness ranging from 2 to 5 microns, and for example, the preferred thickness of 2.5 microns. Because the rim 86 provided on the diaphragm structure 77 surrounding the rectangular diaphragm 79 is relatively thin, the base plate 78 provides support for this rim to provide the necessary strength for the pressure sensor 76.

In order to obtain adequate performance characteristics such as sensitivity in the miniaturized pressure sensor assembly 76 hereinbefore described, it has been found desirable to have as much of the width of diaphragm structure 77 as possible be occupied by the diaphragm 79 and at the same time to minimize the portion of the diaphragm structure 77 occupied by the rim. In order to achieve a diaphragm width ratio of at least 0.45 to 0.9 with respect to the width of the diaphragm 79 to the width of the structure 77 and therefore to obtain the largest diaphragm possible in the diaphragm structure 77, diaphragm 79 is made relatively large compared to rim 86. With current manufacturing technology, it has been found feasible to have a width of rim 86 of 40 microns, which provides for a diaphragm 79 of 170 microns in a 250 micron-wide diaphragm structure 77 to provide a diaphragm width ratio of 0.68. In a larger diaphragm structure such as 350 microns wide, the pressure sensor assembly 76 can be made stronger by increasing the rim width to 90 microns. Alternatively, it can be made more sensitive by increasing the diaphragm width up to 270 microns. This results in a diaphragm width ratio for a 350 micron-wide device of between 0.49 and 0.77, depending on what combination of sensitivity and strength is desired.

Prior to or after the formation of the rectangular diaphragm 79, a plurality of V-shaped recesses or grooves 91 are formed in the diaphragm structure 77 on the end opposite the end at which the diaphragm 79 is located and on the side opposite the side in which the well 84 is formed. These V-shaped recesses 91 also can be formed in a conventional manner by the use of a conventional etch. It should be appreciated that if desired, the etching can be stopped so that the recesses formed are short of a complete V. By way of example, if the etching for the V-shaped recess was stopped at a depth of 12 microns, the bottom of the substantially V-shaped recess or trench 91 would be approximately 8 microns wide.

After the V-shaped or substantially V-shaped recesses have been formed, a P+ diffusion utilizing a suitable material such as boron can be carried out to create a V-shaped region 92 (in the structure 77) which underlies the V-shaped recess 91. Utilizing suitable masking a common layer 93 of a suitable material such as chromium is sputtered into the V-shaped recess 91 to a suitable thickness as for example, 300 Angstroms followed by a layer 94 of a suitable material such as gold of a suitable thickness as for example 3000 Angstroms. The layers 93 and 94 overlie the bottom surface 81 to form pads 96 thereon. In depositing the gold in the V-shaped recess 91 it is desirable to terminate the gold just short of the leftmost extremity of the V-shaped recess as viewed in FIG. 8 in order to minimize the likelihood of lead-to-lead shorting during the dicing operation when a wafer is sawed up into individual sensor chips.

By way of example, the spacing between V-grooves 91 from center to center can be 75 microns with the V-groove having a width of 25 microns and having a typical depth of 18 microns. The metal pads 96 formed by the chromium and gold layers 93 and 94 can have a suitable width as for example, 50 microns with the overlap on each side being approximately 12.5 microns to provide a spacing of approximately 25 microns between adjacent V-shaped pads 96. The bottom of the V-shaped groove can have a total length of approximately 250 microns.

The regions 92 formed from the P+ diffusion have patterns that extend to the right from the three V-shaped recesses 91 as viewed in FIG. 8 for a distance so that they underlie the approximate midpoint of the diaphragm 81 on opposite sides to provide generally U-shaped portions or resistors 92a which are located on the diaphragm in areas of a maximum stress to provide maximum sensitivity to pressure changes. The resistors 92a are provided with opposite ends, one end being connected to one each of the V-grooves and the other end being connected to the center or common V-groove. Contact is made to these P+ diffused regions by the chromium and gold layers 93 and 94 hereinbefore described.

The base plate 78 can be formed of a suitable material such as Pyrex supplied by Corning Glassworks and can have the same width as the diaphragm structure 77 but has a length which is less than the length of the diaphragm structure 77 so that the V-shaped grooves 91 are exposed on the underside of the diaphragm structure 77 as shown in FIG. 6. It also can have a suitable length such as 850 microns. It is provided with a rectangular recess or cavity 101 having substantially the same size as the diaphragm 79. It can be etched into the Pyrex by suitable means such as a conventional etching process utilizing hydrochloric acid. After the etching has been completed to form the rectangular recess 101 it is bonded to the lower surface of the diaphragm structure 77 to form a hermetic seal with respect to the same so that the cavity 101 underlies the diaphragm 79 and is exposed to the bottom surface 81 of the diaphragm 79. The cavity 101 below the diaphragm 79 serves as a reference pressure chamber and can be filled with a suitable fluid. For example, it can be filled with air to half an atmosphere to provide a partial vacuum. Alternatively, the cavity 101 can be filled to one atmosphere or it can be completely evacuated.

A trifilar lead structure 106 is connected to the rectangular diaphragm structure 77. It has insulated copper leads 107 of a suitable diameter as for example 48 AWG soldered into place to the V-shaped recesses 91 so that the leads 107 extend outwardly therefrom and lie in a plane parallel to the plane of the diaphragm structure 77. The trifilar lead construction 106

US 8,419,647 B2

7

provides insulation around each lead and in addition there is provided additional insulation which surrounds the leads and which interconnects the leads into a single unit which can be readily extended through the hypotube forming the flexible elongate member **41**.

The pressure sensor assembly **76** is mounted within a cut-out **111** provided in the transition housing **51** and secured therein by suitable means such as an epoxy **112** so that the outer surface of the pressure sensor assembly **76** is generally flush with the outer surface of the transition housing **51** (see FIG. **3**) and so that the diaphragm **79** is exposed to ambient and the leads **106** extend through the flexible elongate member **41** to the proximal extremity **42** of the same where they are connected to the sleeves (not shown) carried by the proximal extremity **42** disposed within the housing **68**. Also, the conductors **61** and **62** of the velocity sensing transducer **58** are connected to two of such sleeves (not shown) provided on the proximal extremity **42**.

A schematic of the wiring for the pressure sensor assembly **76** is shown in FIG. **12**. The two generally U-shaped portions **92***a* on opposite sides of the diaphragm **79** are represented as resistors and are connected to the three leads **107** in the manner shown. One of the first of the outside leads **107** is "SIGNAL OUT" (+) and the second or other outside lead is "SIGNAL OUT" (−) and the third or middle lead is a common lead as shown. This pattern makes it possible to not cross leads and has the third lead going up the middle or center of the die or the diaphragm structure **77**. It can be seen that the two resistors **92***a* connected as shown form a half bridge one of the resistors responds positively to pressure change and the other resistor responds negatively to a pressure change. Thus, as a pressure is supplied to the diaphragm **79**, one resistor increases in value and the other resistor decreases in value to provide a voltage change. By applying the same current to both resistors at the same time, temperature effects can be measured because temperature change will affect both of the resistors in the same way so that the pressure measurements can be compensated for any changes in temperature which are sensed by the resistors **92***a*. The changes in resistivity caused by the temperature changes in the resistors will cancel each other out because of the half bridge configuration used. In connection with FIG. **12** it can be seen that with the use of three leads it is possible to obtain temperature compensation by utilizing a half-bridge configuration for the pressure sensor. Alternatively, a more precise temperature compensation can be provided by directly measuring the two resistances, and then solving the mathematical equations which relate temperature and pressure to the two sensor resistances.

Operation and use of the guide wire **21** in performing a catheterization procedure such as angioplasty may now be briefly described as follows: Let it be assumed that a guiding catheter (not shown) has been introduced into the femoral artery of the patient **22** shown in FIG. **1** with the distal extremity near the desired location in the heart in which it is desired to perform an angioplasty. The guide wire **21** of the present invention is inserted into the guiding catheter. At the time that its distal extremity is in close proximity to the distal extremity of the guiding catheter, the pressure output signal from the guide wire is compared with that of the guiding catheter assuming that the guide wire is provided with pressure sensing capabilities. If there is a difference between the two pressure measurements, the pressure measurement from the guide wire **21** is equalized with that from the guiding catheter at the control console **29**. The distal extremity of the guide wire **21** is then advanced so that it is proximal of the stenosis to be treated at which time a pressure measurement is made. After this pressure measurement has been recorded, the distal

8

extremity of the guide wire is then advanced through the stenosis and another pressure measurement made to determine whether the stenosis is severe enough to require treatment by angioplasty. Alternatively, the distal extremity of guide wire **21** can be immediately advanced to the distal side of the stenosis rather than making a pressure measurement proximal of the stenosis and thereafter comparing the pressure measurement on the distal extremity being measured by the guide wire **21** with the pressure measurement being provided proximal of the stenosis by the guiding catheter. If it is determined that the stenosis causes a partial occlusion which is severe enough to warrant use of an angioplasty procedure, an angioplasty catheter having a balloon thereon (not shown) can be advanced over the guide wire **21** and advanced into the stenosis to dilate the stenosis. After dilation has occurred, the angioplasty balloon can be withdrawn from the stenosis and pressure measurements can be made proximal and distal of the stenosis to ascertain the effect of the angioplastic treatment. If the pressure measurements indicate that the original dilation by the angioplasty balloon has been inadequate, another balloon catheter as for example, one having a balloon of a greater diameter can then be positioned over the guide wire **21** by utilizing an exchange wire if appropriate. The larger angioplasty catheter can be advanced through the stenosis and inflated to again dilate the stenosis to a larger size after which it can be withdrawn. Thereafter, pressure measurements proximal and distal of the stenosis can again be made to ascertain whether or not the second dilation which has been performed is adequate. The decisions to be made in connection with such procedures can be readily made by use of the control console **29** by observing the traces **33** and **34** on the video monitor **31**.

It also should be appreciated that at the same time Doppler velocity measurements can be made by the transducer **58**. That information can be used in connection with the pressure measurements to ascertain the need for performing the angioplasty procedure or for determining the efficacy of the angioplasty procedure performed. Because of the very small diameters of the guide wires as for example, 0.018" or 0.014", it is possible to utilize the guide wire **21** of the present invention with very small coronary vessels in the heart. In connection with the leads from the Doppler transducer **58** it should be appreciated that if desired some of the conductors provided for the Doppler ultrasound transducer can be shared with the wires or conductors provided for the pressure sensor assembly **76**. Thus, two of the wires for the pressure sensor can be utilized for the Doppler transducer because the pressure sensor operates at DC or up to a few hundred Hz or KHz whereas the Doppler sensor operates at 10 MHz and above. These frequency ranges can be readily separated by one skilled in the art by using simple filters and the appropriate circuitry.

In connection with the present invention it should be appreciated that rather than bonding the leads **107** into the V-grooves or V-shaped recesses **91**, the Pyrex base plate **78** can be formed so it has the same length as the diaphragm structure **77**. V-shaped or U-shaped grooves can be formed in the base plate underlying the V-shaped grooves to in effect form little tunnels which can be utilized for receiving the wires **107** and for them to be soldered therein. Such a construction aids in the placement of wires which are of the very small diameter, as for example, 1 mil.

Another embodiment of a guide wire **121** incorporating the present invention is shown in FIG. **13**. In the guide wire **121**, pressure sensor assembly **76** is mounted in a tip housing **122**. The tip housing **122** can be substituted at the end cap **57** and threaded into the distal extremity **56** of the coil **54**. The tip housing **122** can be formed of a suitable material such as

US 8,419,647 B2

9

stainless steel having an outside diameter of 0.018" and a wall thickness of 0.001" to 0.002". The sensor assembly 76 can be of the type hereinbefore described and can be mounted in a cutout 123 provided in the tip housing 122 much in the same manner as the sensor assembly 76 was mounted in the cutout 111 in the transition housing 51 such as by use of an epoxy 124. An hemispherical end cap 126 formed of a radiopaque material such as palladium or tungsten platinum alloy can be mounted on the distal extremity of the tip housing 122. Alternatively, the end cap 126 can be formed of a non-radiopaque material such as epoxy or silicone rubber.

Thus it can be seen with the embodiment of the guide wire 121 shown in FIG. 13, the guide wire 121 can be utilized in the same manner as the guide wire 21 hereinbefore described with the exception of it cannot be used for making velocity measurements because that capability has been removed from the guide wire 121.

Another guide wire 131 incorporating the present invention is shown in FIG. 14 in which two pressure sensors 76 have been provided. The sensors 76 have been spaced apart a suitable distance as for example, 3 centimeters with one of the pressure sensors being mounted in the transition housing 51 and the other pressure sensor being mounted in a tip housing 122 of the type shown in FIG. 13. With such an arrangement, it can be seen that the distal extremity of the guide wire 131 can be advanced across a stenosis in a vessel with the pressure sensor 76 mounted in the tip housing being distal of the stenosis to measure distal pressure and the pressure sensor 76 in the transition housing 51 being proximal of the stenosis to measure proximal pressure. Thus, it can be seen that it is possible to measure simultaneously the distal pressure and the proximal pressure with respect to a stenosis in a vessel. This may give more accurate measurements than utilizing the proximal pressure being sensed by the guiding catheter.

When using two pressure sensors 76 in the same guide wire as shown in FIG. 14, it is possible to utilize the same common wire for both of the transducers, thus making it necessary to provide only five wires rather than six wires for the two pressure sensors.

Still another guide wire 141 incorporating the present invention is shown in FIG. 15 in which a cover 142 is provided for covering the pressure sensor assembly 76 provided in the transition housing 51. The cover is elongate and extends the length of the cutout 111 and is arcuate in cross-section so that it conforms to the conformation of the transition housing 51. The cover 142 can be secured in place by a suitable means such as an adhesive. The cover 142 overlying the pressure sensor assembly 76 is provided with a pin hole 143 which immediately overlies the diaphragm 79. The pin hole 143 can be of a suitable size as for example 2-5 mils in and preferably 3 mils in diameter. The cover 142 serves to prevent the large opening provided by the cutout 111 from collecting blood which could possibly clot. The cover 142 also serves to protect the sensor 76 from damage. It also prevents the sensor 76 from being broken loose during use of the guide wire 141. It should be appreciated that if desired, the volume beneath the cover 142 can be filled with viscous fluid such as oil which can be utilized for transmitting pressure from the pin hole 143 to the diaphragm 81. With a small size pin hole 143, the viscous fluid provided would not have a tendency to bleed out of the transition housing 51. The viscous fluid would be held in place because of the surface tension of the fluid. Because there is a very short distance between the pin hole 143 and the diaphragm 79, there would be very little tendency for the viscous fluid to damp any pressure signal transmitted from the blood in which the guide wire 141 is disposed to the diaphragm.

10

Another guide wire 151 incorporating the present invention is shown in FIG. 16 having a transition housing 152 formed of a suitable material such as stainless steel and having an OD of 0.018" or less. A pressure sensor assembly 76 of the type hereinbefore described is mounted within the bore 153 of the transition housing 152 and is secured therein by mounting the same in an epoxy 154 while leaving the area immediately above the diaphragm 79 exposed to a pin hole 156 provided in the transition housing 152. The space overlying the diaphragm 81 exposed to the pin hole 156 can be filled with a viscous fluid 157 such as oil. The viscous fluid 157 can be retained within the desired location by a barrier 158 formed on the proximal side of the pressure sensor 76 having the trifilar lead structure 106 extending therethrough, in sealing engagement therewith. To seal the other end of the bore 153, an intermediate end cap 161 can be provided which is provided with a barrier 182 extending thereacross to seal the bore 153. The intermediate end cap 161 can be bonded to the transition housing 152 by a suitable means such as an adhesive (not shown). The coil 54 can be threaded onto the intermediate end cap 161 and can be threaded onto a tip housing 166 that carries a rounded hemispherical tip 167. With such a construction it can be seen that the pressure sensor assembly 76 is protected within the transition housing 152.

In FIG. 16A a guide wire 168 is shown which is very similar to the guide wire 151 with the exception that the housing 152 has been provided on the distal extremity of the coil 46 with the tip 167 directly mounted on the housing 152 for closing the bore 153.

In FIG. 17 there is shown another embodiment of a guide wire 171 incorporating the present invention which has an integral balloon carried thereby. A guide wire with an integral balloon is described in U.S. Pat. No. 5,226,421. The guide wire 171 consists of a flexible elongate tubular member 173 in a manner formed of a suitable material such as plastic which is provided with a distal extremity 174. An inflatable balloon 176 is secured to the distal extremity 174 of the flexible elongate member 173 in a manner well known to those skilled in the art. Such a balloon can be formed integral with the distal extremity and can be formed of the same material as the flexible elongate tubular member 173. Alternatively, it can be formed of a different material or the same material and be formed as a separate part and secured to the distal extremity 174 by suitable means such as adhesive.

The balloon 176 is provided with a distal extremity which is closed and which is secured to the proximal extremity of a coil spring 178 formed of a radiopaque material such as a palladium or tungsten platinum alloy threaded onto a tip housing 179. The tip housing 179 can be formed in a manner similar to the tip housing 122 shown in FIG. 13 having a pressure sensor 76 mounted therein and carrying an end cap 181. The trifilar leads 106 connected to the sensor 76 extend through the coil 178 and through the balloon 176 and through the flexible elongate tubular member 172 to the proximal extremity thereof. A core wire 186 formed of a suitable material such as stainless steel is provided in the flexible elongate member 173 and can be provided with a diameter such as disclosed in U.S. Pat. No. 5,226,421. The core wire 186 is provided with a tapered portion 186a extending through the balloon which has a distal extremity secured to the housing 179 by a suitable means such as the epoxy utilized for mounting the sensor 76 within the housing. The flexible elongate tubular member 172 is provided with a balloon inflation lumen 187 which can be used for inflating and deflating the balloon 176.

US 8,419,647 B2

11                                                                                   12

The guide wire **171** with an integral balloon **171** can be utilized in a manner similar to that hereinbefore described for the other guide wires. Rather than deploying a separate catheter with a balloon thereon over the guide wire, the guide wire **171** itself carries the balloon **176** which can be inflated to dilate the stenosis after the proximal and distal pressure measurements have been made by the tip mounted sensor **76**. After the balloon **176** has been deflated, the pressure measurement can be made to ascertain the pressure in the distal extremity after dilation has occurred. If necessary, the balloon **176** can be re-inflated to perform another dilation of the stenosis to obtain improved blood flow through the stenosis.

After an appropriate dilation has occurred, the guide wire **171** with integral balloon can be removed in a conventional manner. The angioplasty procedure can then be completed in a conventional manner.

From the foregoing, it can be seen that there has been provided an ultra miniature pressure sensor which can be utilized on guide wires having a diameter of 0.018″ and less which can be utilized for making accurate measurements proximal and distal of a stenosis in the coronary vessel. This is made possible because of the small size of the pressure sensor incorporated into the distal extremity of the guide wire. In addition to sensing pressure, flow velocity can also be obtained by the use of a distally mounted velocity transducer provided on the same guide wire as on which the pressure sensor is mounted. Alternatively, additional first and second pressure sensors can be provided on the distal extremity of a guide wire so that pressure measurements can be made simultaneously, proximally and distally of the stenosis. The pressure sensor is constructed in such a manner so that it can be readily incorporated within the confines of a small guide wire as for example, 0.018″ and less. It can be constructed to avoid a large opening in the distal extremity of the guide wire to inhibit or prevent the formation of clots. The pressure sensor also can be protected so that it cannot be readily damaged or broken loose. In addition, where desired, the guide wire can be provided with an integrally mounted balloon on its distal extremity so that the guide wire can be utilized for performing an angioplasty procedure while at the same time facilitating the making of pressure measurements, proximal and distal of the stenosis being treated.

The invention claimed is:

**1**. A method, comprising:

providing a pressure-sensing guidewire that includes:

an elongate tubular member having an outer diameter of 0.018″ or less, the elongate tubular member having a proximal portion and an opposing distal portion;

a core wire extending within the elongate member from the proximal portion to the distal portion;

a flexible element coupled to the distal portion of the elongate tubular member, the flexible element having an outer diameter of 0.018″ or less and an increased flexibility compared to the elongate tubular member;

a sensor housing coupled to the flexible element, the sensor housing having an outer diameter of 0.018″ or less and a length between 1 mm and 5 mm, the sensor housing having an external wall, a lumen, and an opening extending through a portion of the external wall to the lumen;

a pressure sensor assembly disposed within the sensor housing and in fluid communication with the opening of the sensor housing;

a first electrical conductor electrically coupled to the pressure sensor assembly, the first electrical conductor extending from the pressure sensor assembly to the proximal portion of the elongate member;

a second electrical conductor electrically coupled to the pressure sensor assembly, the second electrical conductor extending from the pressure sensor assembly to the proximal portion of the elongate member;

a third electrical conductor electrically coupled to the pressure sensor assembly, the third electrical conductor extending from the pressure sensor assembly to the proximal portion of the elongate member; and

a flexible structure coupled to and extending distally from the sensor housing, the flexible structure including a radiopaque material and having an outer diameter of 0.018″ or less;

inserting at least a distal portion of the pressure-sensing guidewire into a vessel having a stenosis;

obtaining a first pressure measurement within the vessel with the pressure sensor assembly positioned proximal of the stenosis; and

obtaining a second pressure measurement within the vessel with the pressure sensor assembly positioned distal of the stenosis.

**2**. The method of claim **1**, wherein the flexible element of the provided pressure-sensing guidewire has a length of approximately 27 cm.

**3**. The method of claim **2**, wherein the flexible structure of the provided pressure-sensing guidewire has a length of approximately 3 cm.

**4**. The method of claim **3**, wherein the flexible structure of the provided pressure-sensing guidewire is a coil.

**5**. The method of claim **4**, wherein the coil of the provided pressure-sensing guidewire is formed of a metal.

**6**. The method of claim **5**, wherein the coil of the provided pressure-sensing guidewire is formed of a material selected from the group of metals consisting of stainless steel, palladium, and tungsten platinum alloy.

**7**. The method of claim **1**, wherein each of the elongate member, the flexible element, the sensor housing, and the flexible structure has an outer diameter of approximately 0.014″.

**8**. The method of claim **1**, wherein the sensor housing of the provided pressure-sensing guidewire is approximately 2 mm.

**9**. The method of claim **1**, wherein the pressure sensor assembly of the provided pressure-sensing guidewire is mounted within the sensor housing such that an outer surface of the pressure sensor assembly is flush with an outer surface of the sensor housing.

**10**. The method of claim **1**, wherein the pressure sensor assembly of the provided pressure-sensing guidewire is mounted within the sensor housing such that there is a distance between the opening and a diaphragm of the pressure sensor assembly.

**11**. The method of claim **1**, wherein the pressure sensor assembly of the provided pressure-sensing guidewire is secured to the sensor housing by an adhesive.

**12**. The method of claim **11**, wherein the adhesive securing the pressure sensor assembly to the sensor housing is an epoxy.

**13**. The method of claim **1**, wherein a distal section of the core wire of the provided pressure-sensing guidewire is tapered.

**14**. The method of claim **13**, wherein the tapered distal section of the core wire tapers from a larger diameter to a smaller diameter as the core wire extends distally.

**15**. The method of claim **1**, wherein the pressure sensor assembly of the provided pressure-sensing guidewire has a width that is less than a width of the lumen of the sensor housing.

US 8,419,647 B2

13 14

**16**. The method of claim **1**, wherein the sensor housing of the provided pressure-sensing guidewire has a wall thickness between 0.001" and 0.002".

**17**. The method of claim **1**, further comprising comparing the first pressure measurement from the pressure-sensing guidewire to a pressure measurement from a guiding catheter.

**18**. The method of claim **17**, further comprising equalizing the obtained pressure measurement from the pressure-sensing guidewire to the pressure measurement from the guiding catheter.

**19**. The method of claim **17**, further comprising inserting at least the distal portion of the pressure-sensing guidewire through the guiding catheter.

**20**. The method of claim **17**, wherein the obtained pressure measurement from the pressure-sensing guidewire is obtained with the pressure sensor assembly of the pressure-sensing guidewire positioned distal of a stenosis of the vessel.

**21**. The method of claim **17**, further comprising performing an angioplasty procedure.

**22**. The method of claim **21**, wherein performing the angioplasty procedure includes advancing an angioplasty catheter over the pressure-sensing guidewire.

**23**. The method of claim **22**, wherein performing the angioplasty procedure further includes inflating a balloon of the angioplasty catheter to dilate the stenosis of the vessel.

**24**. The method of claim **1**, further comprising comparing the second pressure measurement from the pressure-sensing guidewire to a pressure measurement from a guiding catheter.

**25**. The method of claim **1**, wherein the provided pressure-sensing guidewire further comprises a Doppler transducer.

**26**. The method of claim **25**, further comprising making a Doppler velocity measurement within the vessel with the Doppler transducer.

**27**. A method of evaluating a vessel of a patient with a pressure-sensing guidewire, comprising:

providing a pressure-sensing guidewire that includes:

an elongate tubular member having an outer diameter of 0.018" or less, the elongate tubular member having a proximal portion and an opposing distal portion;

a core wire extending within the elongate member from the proximal portion to the distal portion;

a flexible element coupled to the distal portion of the elongate tubular member, the flexible element having an outer diameter of 0.018" or less and an increased flexibility compared to the elongate tubular member;

a sensor housing coupled to the flexible element, the sensor housing having an outer diameter of 0.018" or less and a length between 1 mm and 5 mm, the sensor housing having an external wall, a lumen, and an opening extending through a portion of the external wall to the lumen;

a pressure sensor assembly disposed within the sensor housing and in fluid communication with the opening of the sensor housing;

a first electrical conductor electrically coupled to the pressure sensor assembly, the first electrical conductor extending from the pressure sensor assembly to the proximal portion of the elongate member;

a second electrical conductor electrically coupled to the pressure sensor assembly, the second electrical conductor extending from the pressure sensor assembly to the proximal portion of the elongate member;

a third electrical conductor electrically coupled to the pressure sensor assembly, the third electrical conductor extending from the pressure sensor assembly to the proximal portion of the elongate member; and

a flexible structure coupled to and extending distally from the sensor housing, the flexible structure including a radiopaque material and having an outer diameter of 0.018" or less; and

obtaining a pressure measurement from within the vessel with the pressure sensor assembly of the pressure-sensing guidewire.

**28**. The method of claim **27**, wherein the flexible element of the provided pressure-sensing guidewire has a length of approximately 27 cm.

**29**. The method of claim **28**, wherein the flexible structure of the provided pressure-sensing guidewire has a length of approximately 3 cm.

**30**. The method of claim **29**, wherein the flexible structure of the provided pressure-sensing guidewire is a coil.

**31**. The method of claim **30**, wherein the coil of the provided pressure-sensing guidewire is formed of a metal.

**32**. The method of claim **31**, wherein the coil of the provided pressure-sensing guidewire is formed of a material selected from the group of metals consisting of stainless steel, palladium, and tungsten platinum alloy.

**33**. The method of claim **27**, wherein each of the elongate member, the flexible element, the sensor housing, and the flexible structure has an outer diameter of approximately 0.014".

**34**. The method of claim **27**, wherein the sensor housing of the provided pressure-sensing guidewire is approximately 2 mm.

**35**. The method of claim **27**, wherein the pressure sensor assembly of the provided pressure-sensing guidewire is mounted within the sensor housing such that an outer surface of the pressure sensor assembly is flush with an outer surface of the sensor housing.

**36**. The method of claim **27**, wherein the pressure sensor assembly of the provided pressure-sensing guidewire is mounted within the sensor housing such that there is a distance between the opening and a diaphragm of the pressure sensor assembly.

**37**. The method of claim **27**, wherein the pressure sensor assembly of the provided pressure-sensing guidewire is secured to the sensor housing by an adhesive.

**38**. The method of claim **37**, wherein the adhesive securing the pressure sensor assembly to the sensor housing is an epoxy.

**39**. The method of claim **27**, wherein a distal section of the core wire of the provided pressure-sensing guidewire is tapered.

**40**. The method of claim **39**, wherein the tapered distal section of the core wire tapers from a larger diameter to a smaller diameter as the core wire extends distally.

**41**. The method of claim **27**, wherein the pressure sensor assembly of the provided pressure-sensing guidewire has a width that is less than a width of the lumen of the sensor housing.

**42**. The method of claim **27**, wherein the sensor housing of the provided pressure-sensing guidewire has a wall thickness between 0.001" and 0.002".

**43**. The method of claim **27**, wherein the pressure measurement is obtained with the pressure sensor assembly of the pressure-sensing guidewire positioned distal of a stenosis of the vessel.

**44**. The method of claim **27**, wherein the pressure measurement is obtained with the pressure sensor assembly of the pressure-sensing guidewire positioned proximal of a stenosis of the vessel.

**15**

**45**. The method of claim **27**, further comprising comparing the obtained pressure measurement from the pressure-sensing guidewire to a pressure measurement from a guiding catheter.

**46**. The method of claim **45**, further comprising equalizing the obtained pressure measurement from the pressure-sensing guidewire to the pressure measurement from the guiding catheter.

**47**. The method of claim **45**, further comprising inserting at least the distal portion of the pressure-sensing guidewire through the guiding catheter.

**48**. The method of claim **45**, wherein the obtained pressure measurement from the pressure-sensing guidewire is obtained with the pressure sensor assembly of the pressure-sensing guidewire positioned distal of a stenosis of the vessel.

**49**. The method of claim **45**, wherein the obtained pressure measurement from the pressure-sensing guidewire is

**16**

obtained with the pressure sensor assembly of the pressure-sensing guidewire positioned proximal of a stenosis of the vessel.

**50**. The method of claim **45**, further comprising performing an angioplasty procedure.

**51**. The method of claim **50**, wherein performing the angioplasty procedure includes advancing an angioplasty catheter over the pressure-sensing guidewire.

**52**. The method of claim **51**, wherein performing the angioplasty procedure further includes inflating a balloon of the angioplasty catheter to dilate the stenosis of the vessel.

**53**. The method of claim **27**, wherein the provided pressure-sensing guidewire further comprises a Doppler transducer.

**54**. The method of claim **53**, further comprising making a Doppler velocity measurement within the vessel with the Doppler transducer.

\*    \*    \*    \*    \*

## CERTIFICATE OF SERVICE AND FILING

I certify that I electronically filed the foregoing document using the Court's

CM/ECF filing system.  Counsel was served via CM/ECF on March 27, 2014.


Mr. Daniel E. O'Toole
Clerk of Court
United States Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Room 401
Washington, DC  20439

John Allcock                                   *Attorneys for Appellee*
Stuart E. Pollack
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, NY 10020


                                        /s/ Craig E. Countryman
                                        Craig E. Countryman

## **CERTIFICATE OF COMPLIANCE**

The undersigned attorney certifies that the opening brief for Appellant Volcano Corporation complies with the type-volume limitation set forth in Fed. R. App. P. 32(a)(7)(B).  The relevant portions of the brief, including all footnotes, contain 7,576 as determined by Microsoft Word.

Dated:  March 27, 2014

/s/ Craig E. Countryman
Craig E. Countryman
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Telephone:  (858) 678-5070
Facsimile:  (858) 678-5099

*Attorney for Appellant,*
Volcano Corporation